In re Roy W. TALMO, Debtor.

Bankruptcy No. 93–32745–BKC–RAM.

United States Bankruptcy Court,
S.D. Florida.

Aug. 17, 1995.

Amber Donner, U.S. Trustee, Miami, FL.

Arthur Halsey Rice, Arthur Halsey Rice & Associates, Miami, FL, Scott Callahan, Frith & Stump, P.A., Orlando, FL, for The Reliant Group.

Robert Gilbert, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., West Palm Beach, FL, for F.D.I.C.

Paul McMahon, Schulte, Blum, et al., Miami, FL, for Citibank & Blackhawk.

David Profilet, Profilet & Associates, Miami, FL, for Soneet Kapila, Trustee for Estate of Data Lease Financial Corp.

Robert C. Furr, Furr & Cohen, Boca Raton, FL, for Roy W. Talmo.

### MEMORANDUM OPINION AND ORDER STRIKING AMENDMENT TO DEBTOR'S SCHEDULE OF PROPERTY CLAIMED AS EXEMPT

ROBERT A. MARK, Bankruptcy Judge.

This Chapter 11 case was converted to Chapter 7 in November 1994 after several unsuccessful attempts by the debtor to reorganize. This opinion considers whether the debtor should now be allowed to amend his schedules to claim property as exempt which he previously scheduled as non-exempt and included as part of his proposed plans. Despite the generally permissive rules allowing amendments during a case, the facts and circumstances in this case require the Court to disallow the amendment.

## INTRODUCTION

Roy W. Talmo ("Talmo" or "Debtor") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on August 13, 1993 (the "Petition Date"). The case subsequently was converted to Chapter 7, and on February 24, 1995, Talmo filed an amendment to his schedules in order to claim additional real and personal property as exempt. Most significantly, he amended his homestead exemption claim from 30 acres to approximately 152 acres. On March 14, 1995, the Trustee, Kenneth Welt, filed "Trustee's Objections to Debtor's Amended Claim of Exemptions," and on March 24, 1995 filed "Trustee's Supplemental Objection to Debtor's Amended Claim of Exemptions." Additional objections were filed by several other parties, specifically: "Objections of FDIC as Receiver to Exemptions of Debtor" filed March 20, 1995; "Objections of Citibank and Blackhawk to Exemption of Debtor" filed March 24, 1995; "Objections of the Reliant Group to Exemptions Claimed by Debtor" filed March 23, 1995; and "Limited Joinder by Soneet R. Kapila, Trustee for the Estate of Data Lease Financial Corporation in Objections of FDIC as Receiver to Exemptions of Debtor" filed March 22, 1995.

On May 9, 1995 the Court commenced a hearing on all the objections. Further hearing was conducted May 11 and 12, 1995. For the reasons that follow, based upon the Court's review of the record, including the testimony and exhibits offered at trial, the arguments of counsel, and consideration of applicable case law, the objections are sustained and the Debtor's amended claim of exemption is stricken.

## FACTUAL AND PROCEDURAL BACKGROUND

### THE DEBTOR

Talmo is a sophisticated investor with an extensive background in commercial transactions, particularly banking. In 1963, Talmo purchased and became a shareholder of Commerce National Bank in Lake Worth, Florida ("Commerce National"). In 1966, Talmo acquired and became a shareholder and chief executive of the First American Bank in North Palm Beach, Florida ("First American"). In 1969 Talmo formed and ultimately became the sole shareholder of Funding, Inc., a corporation which in turn held a majority stake in Data Lease Financial Corporation along with other holdings. Data Lease Financial Corporation was a single bank holding company which by 1978 held 80% of the stock of First American and Commerce National. In 1980, First American merged with Commerce National, with First American being the successor. Talmo remained chief executive of First American until 1989. First American failed in 1989 and eventually was placed in receivership by the FDIC.

### THE PROPERTY

On December 23, 1980, Talmo acquired title to property located in Boynton Beach, Florida consisting of approximately 300 acres of farm land (the "Property"). In 1986, Talmo paid off the mortgage on 30 acres of the Property (the "30–Acre Sub–Parcel") and took out a first mortgage with Community Federal Savings and Loan ("Community Savings") on the 30 acres to fund the construction of a home which he built on the Property. In late 1988 Talmo moved into the home, and in early 1989 he filed a homestead tax exemption application with the Tax Assessor of Palm Beach County on the west 160 acres of the Property (the "West 160 Parcel"), which included the 30–Acre Sub–Parcel on which the home was built. The County granted the homestead tax exemption and the tax exemption has been renewed from year to year to the present date. Talmo leased the east 140 acres (the "East 140 Parcel") to various farmers until the East 140 Parcel was sold by the Trustee in this case in March of this year.[1]

The West 160 Parcel, including the 30–Acre Sub–Parcel containing Talmo's home, was leased on a verbal lease to two corporations owned by Talmo, RWT Company, Inc.

1. Of the original 300 acres of the Property, approximately 10 acres were deeded to the County, so that the East 140 Parcel now is actually approximately 137.5 acres and the West 160 Parcel is approximately 152.5 acres.

and RWT Nursery, Inc. (collectively, the "RWT Corporations"). With the exception of several acres surrounding the home, the entire West 160 Parcel contains trees planted for the RWT Corporations or nursery buildings and plants belonging to the RWT Corporations. Talmo ran the RWT Corporations prior to and during his Chapter 11 case.

### THE LIENS

As of the Petition Date, the 30–Acre Sub-Parcel was encumbered by the Community Savings mortgage. In addition, a tax certificate for the unpaid 1991 taxes held by Palm Beach County, Florida, in the amount of $4,691.14 (the "1991 Tax Certificate") encumbered the West 160 Parcel, including the 30–Acre Sub–Parcel. Farm Credit of South Florida ("Farm Credit") presently holds a first mortgage on approximately 118 acres of the West 160 Parcel (the "118–Acre Sub-Parcel") as successor or assignee of certain mortgages Talmo executed in 1985 and 1986 in favor of the Federal Land Bank of Columbia, S.C. (the "Farm Credit Mortgage"). The Farm Credit Mortgage is secured by all of the West 160 Parcel except the 30–Acre Sub–Parcel which secures the Community Savings mortgage, and a 3.89 acre strip which apparently is unencumbered by either the Farm Credit Mortgage or Community Savings mortgage.

On February 28, 1988, Talmo executed a mortgage in favor of First American in the original principal amount of $1.7 million, secured by both the 118–Acre Sub–Parcel and the East 140 Parcel. This mortgage (the "FDIC Mortgage") is now held by the Federal Deposit Insurance Corporation ("FDIC"), as receiver for First American. The FDIC Mortgage is second in priority to the Farm Credit Mortgage on the 118–Acre Sub–Parcel, and is first in priority on the East 140 Parcel. On May 21, 1993, the FDIC obtained a Summary Final Judgment of Foreclosure on its mortgage, in the United States District Court for the Southern District of Florida. The foreclosure sale was scheduled

to take place on August 17, 1993, but was stayed by the filing of the petition.

Thus, as of the Petition Date, the 118–Acre Sub-Parcel was encumbered by the following liens and encumbrances relevant to this opinion, in order of priority:[2]

a. the 1991 Tax Certificate;

b. the Farm Credit Mortgage, with an outstanding balance of approximately $630,000;

c. the FDIC Mortgage, with an outstanding balance of approximately $1,700,-000 (the "FDIC Secured Claim"); and

d. A judgment lien in favor of the Resolution Trust Corporation ("RTC") in the amount of $1,364,155, now held by The Reliant Group ("Reliant Judgment Lien").

As of the Petition Date, the East 140 Parcel was encumbered by the following liens and encumbrances, in order of priority:

a. the FDIC Secured Claim; and

b. the Reliant Judgment Lien.

### TALMO'S INITIAL SCHEDULES

On September 9, 1993, Talmo filed his bankruptcy schedules with the Court. In the "Schedule A—Real Property" Talmo listed the 30–Acre Sub–Parcel (described as "Residence on 30 acres of land"); the 118–Acre Sub-Parcel (described as "118.62 Acre Farm"); and the East 140 Parcel (described as "145.5 Acre Farm"). The current market values were stated to be $800,000, $1.1 million (approximately $9,300 per acre), and $1.3 million (approximately $9,000 per acre), respectively. Talmo's "Schedule C—Property Claimed as Exempt" claimed only the 30–Acre Sub–Parcel as exempt under the homestead exemption provided by Article X, Section 4 of the Florida Constitution. In the initial schedules, Talmo did not claim the 118–Acre Sub–Parcel as exempt.

The evidence at trial established that Talmo considered but chose not to claim the entire West 160 Parcel, including the 118–Acre Sub–Parcel, as exempt. Prior to filing his bankruptcy petition, Talmo had asserted

---

**2.** For purposes of this opinion the Court is excluding certain judgment liens in which the judgments have been assigned and the liens have

been or will be released, and other judgment liens which are avoidable preferences.

in negotiations with creditors that he was entitled to claim the 118–Acre Sub–Parcel as homestead, and had listed the 118–Acre Sub–Parcel as "Homestead" in a 1992 financial statement. (Trustee's Exhibit 24).[3] In addition, on July 26, 1993, Talmo's lawyer, Lawrence Schantz ("Schantz"), of the law firm Schantz, Schatzman & Aaronson (the "Schantz Firm") sent a letter to James R. Downing, Jr., a credit specialist with the FDIC, which stated that the homestead portion of the Property totalled 160 acres. (TE–27).

When Talmo decided to file a bankruptcy petition, he consulted with the Schantz Firm regarding the advantages and disadvantages of claiming the 118–Acre Sub–Parcel as part of his homestead in his bankruptcy schedules. On August 31, 1993, Talmo sent a letter to the Schantz Firm seeking its advice on the issue. (TE–28). In the letter, Talmo expressed concern that, if he did not claim the 118–Acre Sub–Parcel as exempt, value would be available to his unsecured creditors. Talmo states, in relevant part:

> Taking your number of $9,500 per acre would produce an approximate value of $2.5 million and if you added $1 million as to value of trees in the ground, you are going to end up with a value of $3.5 million vs. $2.3 million debt. This could provide an opening for the unsecured creditors to look for something additional.

Schantz responded to Talmo's letter by a letter dated September 2, 1993 (the "September 2 Letter"), drafted by Alan Perlman ("Perlman"), an attorney at the Schantz Firm, and reviewed by Schantz. (TE–29). The September 2 Letter outlined the possible consequences of either exempting the property in question or including it in Talmo's estate. Schantz counseled Talmo that claiming the homestead exemption for the 118–Acre Sub–Parcel would increase the risk that the FDIC would prevail on a motion for stay relief to allow a judicial sale of the 118–Acre Sub–Parcel, or alternatively would prevail on a motion to dismiss the case as a bad faith filing. The September 2 Letter concluded: "I agree, it is a difficult decision, but one that must be made. Again, although there is some risk, you may want to list the additional acres as exempt now, and to the extent the FDIC moves forward to dismiss the case as filed in bad faith or seeks relief from the automatic stay to continue the foreclosure action, modify your list of exemptions to exclude those acres at that time. However, it may be too late to convince the Bankruptcy Court that your case was not filed solely to stop the foreclosure sale. That its [sic] the dilemma."

On September 9, 1993, Talmo spoke with Perlman and advised him that he would not claim a homestead exemption with respect to the 118–Acre Sub–Parcel. Talmo's decision was reflected in Perlman's handwritten notes from the telephone call. (TE–32).

After filing his initial schedules and prior to the amendment which gives rise to this contested matter, Talmo twice filed amendments to his schedules: on March 3, 1994 he made three additions to his "Schedule B—Personal Property"; and on April 8, 1994 he made additional amendments to Schedule B and to "Schedule D—Creditors Holding Secured Claims". Talmo did not seek to claim the homestead exemption for the 118–Acre Sub–Parcel on either of these occasions.

### COURSE OF PROCEEDINGS IN CHAPTER 11

**A. The Absence of Early Motions to Dismiss for Bad Faith or Motions for Stay Relief.**

There is no direct evidence that Talmo's decision to exempt only the 30–Acre Sub–Parcel directly induced the FDIC to refrain from moving to dismiss the case as a bad faith filing early in the case. Nevertheless, the record does reflect that neither the FDIC nor any other creditor filed a motion to dismiss for bad faith, and neither the FDIC nor Farm Credit sought stay relief during the Chapter 11 case as to the 118–Acre Sub–Parcel.

**B. The Initial Motion to Convert.**

On March 10, 1994, the FDIC and others creditors filed a motion to convert this case

---

3.  Hereafter, Trustee's Exhibits shall be referred to as "TE–#".

from Chapter 11 to a Chapter 7 liquidation (the "Initial Motion to Convert"). After lengthy evidentiary hearings in April and May, 1994, Talmo defeated the Initial Motion to Convert, in part by representing that all of his non-exempt assets, including the 118–Acre Sub–Parcel and the assets of his various companies such as the RWT Corporations, would be dedicated to his plan of reorganization.

The strategy for defending against the Initial Motion to Convert was devised by the Schantz Firm and the law firm of Robert L. Roth, P.A. (the "Roth Firm"), which became counsel for Talmo after the Schantz Firm was disqualified. The Roth Firm and the Schantz Firm believed that a dedication of assets by Talmo would help establish the viability of any plan of reorganization Talmo would propose. Talmo agreed with this strategy.

While the Initial Motion to Convert was pending, Talmo discussed the issue of a potential homestead exemption with Robert L. Roth ("Roth"), then his lead counsel. Roth "believe[d] that Mr. Talmo's creditors and the Court were very concerned with some of the things that Mr. Talmo had done both before and after the commencement of his chapter 11 case," and that amending his homestead exemption to claim the 118–Acre Sub–Parcel as exempt would "enrage" the creditors and reduce his chance of defeating the Initial Motion to Convert. (TE–46, Sworn Declaration of Robert L. Roth). Talmo was advised of and agreed with Roth's assessment, and no amendment to Talmo's schedule of exempt property was made at that time. (TE–46).

### C. Talmo's Plans of Reorganization.

During the Chapter 11 case, Talmo filed four plans and disclosure statements: (i) his first Disclosure Statement and Plan of Reorganization on March 31, 1994; (ii) an Amended Disclosure Statement and Plan of Reorganization, on or about June 1, 1994; (iii) a Second Amended Disclosure Statement and Second Amended Plan of Reorganization, on or about August 15, 1994; and (iv) a Third Amended Plan of Reorganization, on November 8, 1994. None of the first three plans

received the necessary votes to confirm, and the fourth plan was never submitted to creditors due to conversion of the case.

In each of his plans, Talmo treated the 118–Acre Sub–Parcel as non-exempt property and the 30–Acre Sub–Parcel as his exempt homestead. None of the plans or disclosure statements refer to the possibility that Talmo might later claim the 118–Acre Sub–Parcel as exempt. In fact, the liquidation analysis in each of the disclosure statements, which assumes a conversion of Talmo's Chapter 11 case to a case under Chapter 7, includes the 118–Acre Sub–Parcel as non-exempt property. Talmo signed each of the plans and disclosure statements.

### D. The Benlate Litigation.

In 1992, the RWT Corporations asserted certain claims in state court in an action styled *RWT Nursery, Inc. and RWT Tree, Inc. v. E.I. DuPont de Nemours & Co., Inc.*, (the "Benlate Litigation"), for damage to their inventory and personal property that allegedly occurred as a result of the use of Benlate, a fungicide manufactured and distributed by E.I. DuPont de Nemours & Co., Inc. ("DuPont"). In early June of 1994, DuPont offered to settle the Benlate Litigation for $1,000,000 (the "Settlement"). After payment of the contingency fee for the RWT Corporations' counsel, the net proceeds from the Settlement were $750,000 (the "Settlement Proceeds"). During the bankruptcy case, Talmo did not disclose the existence of the Benlate Litigation to the Court, his creditors, or his own counsel, until after the attorney representing the RWT Corporations in the Benlate Litigation called Roth to inform him of the settlement offer.

Talmo admitted at trial that he did not initially want the Benlate Settlement Proceeds to go to his creditors. (Transcript of Trial, May 11, 1995, p. 273). According to Roth's testimony, Talmo was "not happy" when told that the Settlement Proceeds were part of the estate since Talmo had already acknowledged that his corporations' assets were part of his estate. (TE–46). On June 13, 1994, Talmo filed an Emergency Motion to Approve Compromise of Claim of Non–Debtor Related Entities (the "Settlement

Motion"). In the Settlement Motion, the Debtor sought to tie the unsecured creditors' distributions under a plan to the amount of the Settlement Proceeds. At no point during consideration of the Settlement Motion did Talmo advise the Court or his creditors that he believed he had potential individual claims against DuPont or against the RWT Corporations for damages to the 118–Acre Sub–Parcel as a result of their use of Benlate.

After the hearing, the Court approved the Settlement and permitted Talmo's estate to pay the contingency fee of counsel and realize the Settlement Proceeds. The request to tie approval to any plan treatment was withdrawn. The FDIC as receiver has asserted a lien against the Settlement Proceeds.

### E. The Final Motion to Convert.

On November 7, 1994, the United States Trustee filed a motion to convert Talmo's case from a Chapter 11 to a Chapter 7 (the "Final Motion to Convert"), due to Talmo's inability to present a confirmable plan of reorganization. In response to the motion, on November 8, 1994, Talmo filed the Third Amended Plan of Reorganization. In the Third Amended Plan, Talmo proposed to give the East 140 Parcel to the FDIC in satisfaction of the FDIC Mortgage and FDIC Secured Claim, on the basis of the value ascribed to the East 140 Parcel by the FDIC. Talmo, however, sought to maintain a low value for the 118–Acre Sub–Parcel.

After a hearing on November 9, 1994, the Court granted the Final Motion to Convert and on November 10, 1994 entered its Order Converting Case Under Chapter 11 to Case Under Chapter 7, Denying Debtor's Motion for Leave And Denying Creditor's Motion for Valuation. Also on November 10, 1994, the Office of the U.S. Trustee filed a Notice of Appointment of Chapter 7 Trustee, appointing Kenneth Welt as trustee (the "Trustee").

### PROCEEDINGS AFTER CONVERSION TO CHAPTER 7

Immediately after his appointment, the Trustee began to market the 118–Acre Sub–Parcel, and the East 140 Parcel. The Trustee and Trustee's counsel, Arthur Halsey Rice and Associates P.A. (the "Rice Firm"), also began negotiations with Talmo, through his counsel at the Roth Firm, regarding a potential repurchase by Talmo of the estate's nonexempt assets. During these negotiations neither Talmo nor his counsel advised the Trustee or Trustee's counsel that Talmo might amend his homestead exemption to include the 118–Acre Sub–Parcel. In fact, Talmo offered to repurchase the 118–Acre Sub–Parcel from the Trustee in a December 8, 1994 letter from Jordi Guso ("Guso"), an attorney at the Roth Firm, to Arthur Halsey Rice ("Rice"), a partner at the Rice Firm. (TE–35).

Within a month of his appointment, the Trustee received an offer on the East 140 Parcel for a price in excess of $12,000 per acre. This offer was consistent with the valuation of the East 140 Parcel by the appraisers retained by the Trustee. On December 27, 1994, the Trustee received a letter of intent from William Mazzoni ("Mazzoni"), who offered to purchase the East 140 Parcel for a price of $14,500 per acre. (Exhibit 13). On January 13, 1995, the Trustee and Mazzoni entered into a contract pursuant to which Mazzoni agreed to purchase the East 140 Parcel for $14,500 an acre (the "East 140 Parcel Sale"). (Exhibit 14). Prior to execution of the contract, on January 4, 1995, the FDIC filed a motion for relief from the automatic stay in order to foreclose on the 118–Acre Sub–Parcel and the East 140 Parcel, together with the personal property covered by its judgment.

On January 17, 1995, the Trustee filed a motion seeking approval of the East 140 Parcel Sale. The FDIC filed a limited objection to the sale, on the basis that it wanted the proceeds of the sale to be applied to its claim under the FDIC Mortgage at closing. On February 21, 1995, the Court held a hearing on the approval of the East 140 Parcel Sale and sustained the FDIC's request for payment from the proceeds. On February 24, 1995, the Court entered an order approving the East 140 Parcel Sale and requiring that all but a small portion of the net sales proceeds be paid to the FDIC.

### THE DECISION TO AMEND

On January 13, 1995, after being advised of the offer to purchase the East 140 Parcel,

Talmo and Guso met with Schantz. (TE–43, Sworn Declaration of Jordi Guso). Perlman was also present for a portion of this meeting. The purpose of this meeting was to discuss whether Talmo should now claim the homestead exemption with respect to the 118–Acre Sub–Parcel. (TE–43). Talmo and his present and former attorneys were aware of the proposed East 140 Parcel Sale and knew that the sale would effectively free up value on the 118–Acre Sub–Parcel, since the sale proceeds from the East 140 Parcel would satisfy the FDIC Mortgage.

All parties at this meeting, including Talmo, agreed by the conclusion of the meeting that Talmo should amend his Schedule C to include both the 30–Acre Sub–Parcel and the 118–Acre Sub–Parcel as exempt property pursuant to the homestead exemption. Talmo and his attorneys also decided to wait until after the East 140 Parcel Sale before filing the amendment, to ensure that the FDIC Mortgage would be satisfied from the proceeds of that sale. (TE–43).

After the hearing to approve the sale, on or about February 24, 1995, approximately one and one-half years after the Petition Date, Talmo filed an amendment to his Schedule C (the "Amendment").[4] In the Amendment, Talmo for the first time asserted a homestead exemption in (i) the 118–Acre Sub–Parcel; (ii) certain causes of action against the RWT Corporations with respect to damage to the 118–Acre Sub–Parcel allegedly sustained from the use of Benlate on the crops of the RWT Corporations; and (iii) certain unliquidated claims, valued at approximately $1 million, against DuPont for damages to the 118–Acre Sub–Parcel and alleged misrepresentations relating to the settlement of the Benlate Litigation.[5] The filing of the

Amendment prompted the objections by the Trustee and other parties which are resolved by this opinion.

## DISCUSSION

■  The Trustee urges the Court to exercise its discretion to deny the Debtor leave to amend his claimed exemptions. Alternatively, the Trustee argues that even if the Amendment is permitted, Talmo cannot claim the 118–Acre Sub–Parcel as exempt because he did not intend to make that parcel part of his residence, because the commercial use of the property was not consistent with his primary business or occupation, and because the property was leased to third party corporations. Since the Court determines that the amendment should not be allowed, this opinion will not reach the issue of whether Talmo, if permitted, could validly assert an entitlement to homestead exemption for the 118–Acre Sub–Parcel under Article X, Section 4 of the Florida Constitution.

■  Bankruptcy Rule 1009(a) provides, "A voluntary petition, list, schedule, or statement may be amended by the debtor as a matter of course at any time before the case is closed." Rule 1009 adopts a permissive approach that freely allows amendments to lists or schedules without court permission at any time during the case. *In re Magallanes,* 96 B.R. 253 (9th Cir. BAP 1988). Despite the permissive language of the rule, the Court has the discretion to not permit amendments: (i) if the proposed amendment would prejudice creditors; (ii) if the debtor has acted in bad faith; or (iii) if the debtor concealed assets. *See Matter of Doan,* 672 F.2d 831 (11th Cir.1982).[6] The exceptions recognized by the Eleventh Circuit in *Doan*

4.  At trial, Talmo introduced a letter dated February 17, 1995 from his attorney, Robert Furr, to Rice, Trustee's counsel, advising that Talmo would be amending his exemptions to include the 118–Acre Sub–Parcel. (Debtor's Exhibit 17). This letter apparently was telecopied to Rice prior to the February 21, 1995 hearing to approve the East 140 Parcel Sale, but the proposed amendment was not raised at the hearing and its possible impact on the sale and use of sale proceeds was not addressed by the parties or the Court.

5.  Pursuant to a letter dated April 24, 1995, Talmo's counsel advised the parties that he was "modifying the claim of exemption on the Benlate Claim to narrow it down to only a claim by Talmo against his corporations for their use of Benlate on the property. This is a claim against the $750,000.00 held by the Trustee." (TE–38).

6.  Although the Eleventh Circuit in *Doan* says a court may "deny leave to amend" in these circumstances, 672 F.2d at 833, it may be more appropriate to refer to the relief as striking the amendment, since the debtor does not have to seek leave to amend under Fed.R.Bankr.P. 1009.

have been adopted and applied by numerous other courts. *See, e.g., Matter of Yonikus,* 996 F.2d 866, 872 (7th Cir.1993); *Magallanes, supra; In re Kobaly,* 142 B.R. 743 (Bankr.W.D.Pa.1992); *In re Myatt,* 101 B.R. 197 (Bankr.E.D.Cal.1989). Bad faith or prejudice to creditors must be shown by clear and convincing evidence. *Kobaly,* 142 B.R. at 748–49. Any one of these three factors standing alone would be sufficient grounds to strike an amended claim of exemption. Here, the Trustee proved that each of these circumstances exist, strongly compelling a decision to disallow the Amendment.

## PREJUDICE TO TRUSTEE AND CREDITORS

■ In determining whether to deny an amendment to schedules on the basis of prejudice, the focus is on the effect of allowing the amendment upon creditors and other parties in interest. Mere delay in filing an amendment, or the fact that an amendment if allowed will result in the exemption being granted, are not sufficient to show prejudice. *See Doan,* 672 F.2d at 833. This Court finds, nonetheless, that prejudice may be established by showing harm to the litigating posture of parties in interest. If the parties would have taken different actions or asserted different positions had the exemption been claimed earlier, and the interests of those parties are detrimentally affected by the timing of the amendment, then the prejudice is sufficient to deny amendment. Moreover, an amendment is prejudicial if it impairs a trustee in the diligent administration of the estate. Allowing the Amendment at this stage of Talmo's case would prejudice the Trustee, Talmo's estate, and Talmo's creditors in several respects.

### A. Effect of Talmo's Failure to Claim Homestead Exemption on Proceedings in Chapter 11.

All parties in interest were prejudiced by Talmo's failure to claim a homestead exemption at the outset of the case because the inclusion of the 118–Acre Sub–Parcel as nonexempt property changed the entire posture, development, timing, duration, and costs of the chapter 11 case. The best evidence of this is the testimony and evidence of Talmo's own counsel. In the September 2 Letter, Schantz advised Talmo that excluding the 118–Acre Sub–Parcel from the assets of the estate pursuant to a claimed homestead exemption might result in the FDIC pursuing and obtaining either relief from the automatic stay to pursue foreclosure of the 118–Acre Sub–Parcel, or dismissal of the Chapter 11 case as a bad faith filing. Moreover, Farm Credit likely would have pursued relief from the automatic stay on the ground that the 118–Acre Sub–Parcel, as exempt property, was not necessary to an effective reorganization and that, based upon the low value that Talmo was urging the Court and the creditors to accept, there was no equity in the 118–Acre Sub–Parcel.

At the time of the Initial Motion to Convert, Roth and Talmo discussed claiming the 118–Acre Sub–Parcel as exempt and agreed that the amendment likely would result in the motion being granted. Furthermore, amendment of the claimed exemptions at that time would have been inconsistent with the principal defense that Talmo employed in defeating the Initial Motion to Convert—that Talmo would be dedicating all his assets (with the exception of the 30–Acre Sub–Parcel and certain nominal exempt personal property) to a plan of reorganization. The Court more likely would have granted the Initial Motion to Convert if the 118–Acre Sub–Parcel was not part of the proposed plan described at the hearing on the motion.

Finally, claiming the 118–Acre Sub–Parcel as exempt property at the outset of the case or shortly thereafter would have made it difficult, if not impossible, for Talmo to formulate a plan of reorganization that had even a chance of being confirmed. The profits of the RWT Corporations were among the principal sources of funding for the various plans of reorganization that Talmo proposed. The RWT Corporations are located on the 118–Acre Sub–Parcel and it was not economically feasible to move these businesses, so Talmo would have had to commit the 118–Acre Sub–Parcel to his estate or to the RWT Corporations by a long-term lease or otherwise in order to make any plan feasible.

## B. Effect of Talmo's Failure to Claim Homestead Exemption on Timing and Manner of Disposition of Property in Chapter 7.

The Trustee and Talmo's creditors also would be prejudiced by the Amendment, because its allowance would deprive Talmo's estate of the equity in the 118–Acre Sub–Parcel that was created in large part by the East 140 Parcel Sale and paydown of the FDIC Secured Claim ordered by the Court. This is not simply a matter of the amended exemption decreasing the amount of property available for liquidation and distribution, but rather is a function of the manner in which the property could have been applied had the exemption been claimed earlier.

Upon his appointment, the Trustee was charged with the responsibility of promptly disposing of the estate's assets in a manner likely to maximize their value. To that end, the Trustee reviewed the assets available to the estate and the encumbrances upon such assets. Because the FDIC Mortgage encumbered both the East 140 Parcel and the 118–Acre Sub–Parcel, both of which were estate assets, the sale of either parcel would free up value on the other property.

The Trustee put together a marketing package for the 118–Acre Parcel and the East 140 Parcel, compiled a list of prospective buyers, mailed marketing packages to prospective buyers, and met and negotiated with parties who expressed an interest in purchasing the East 140 Parcel or the 118–Acre Sub–Parcel. The contract with Mazzoni and the East 140 Parcel Sale were the results of the Trustee's negotiations and marketing efforts.

If Talmo had asserted a valid homestead exemption with respect to the 118–Acre Sub–Parcel prior to the Trustee's appointment, the Trustee would have employed different business and litigation strategies regarding the Talmo estate's assets. The Trustee and his advisers would not have devoted any efforts or resources to marketing the 118–Acre Sub–Parcel.[7] Most importantly, the Trustee would have tried to find some way to satisfy the FDIC Secured Claim first out of the 118–Acre Sub–Parcel, so that there would be more value in the East 140 Parcel to satisfy other creditors' claims.[8]

Moreover, at the time of the East 140 Parcel Sale, the FDIC's motion for relief from stay and the FDIC's limited objection to the sale regarding the distribution of the proceeds were pending before the Court. If Talmo had validly claimed a homestead exemption for the 118–Acre Sub–Parcel at the outset of his Chapter 11 case, or even at some point prior to the Trustee's appointment, the Trustee likely would have supported the motion for stay relief in order to permit the FDIC to apply the value of that property to the FDIC Secured Claim.

Several other options would have been available if the exemption had been claimed earlier. The Trustee could have considered: (i) delaying the sale of the East 140 Parcel until after the FDIC realized on the value of the 118–Acre Sub–Parcel; (ii) escrowing any proceeds from the East 140 Parcel Sale until after the FDIC realized on the value of the 118–Acre Sub–Parcel, or (iii) exploring ways to obtain an assignment of the FDIC's claim against the 118–Acre Sub–Parcel. It is likely that the FDIC would have cooperated with the Trustee in his efforts to shift the FDIC's secured claim to the 118–Acre Sub–Parcel, because the FDIC is also the largest unsecured creditor of Talmo's estate.

---

7. Prior to the filing of the Amendment, the Trustee had received an offer for the 118–Acre Sub–Parcel on terms substantially similar to those for the East 140 Parcel Sale. The offer was withdrawn by the prospective buyer after Talmo filed the Amendment.

8. Both the Trustee and Talmo have made arguments based on the doctrine of marshalling in connection with disposition of the Property. The Trustee argues that, if the exemption had been claimed, the FDIC could have been required to satisfy its claim first from the 118–Acre Sub–Parcel, thus freeing up value in the East 140 Parcel for the estate and its creditors. Talmo asserts that marshalling against exempt property would be inappropriate, and the FDIC still would be required to satisfy its claim first from the East 140 Parcel. Even if the legal issues are not clear-cut, the prejudice to the Trustee and creditors is the fact that the issues are now mooted by the sale of the East 140 Parcel and distribution of proceeds before any claim of exemption for the 118–Acre Sub–Parcel was made.

It is not possible to state with any certainty what options the Trustee would have pursued if Talmo had claimed a valid homestead exemption with respect to the 118–Acre Sub–Parcel before the Trustee's appointment. What is certain is that Talmo's failure to claim as exempt the 118–Acre Sub–Parcel caused the Trustee to devote time and resources to the marketing of the 118–Acre Sub–Parcel that he otherwise would not have spent, and prevented the Trustee from pursuing business and litigation strategies that he would have considered if he was aware of a valid claim of exemption. As a result, the Trustee and Talmo's estate would be prejudiced by allowing the Amendment at this time.

Both unsecured creditors and judgment lien creditors also would be prejudiced by allowing the Amendment at this time. Judgment creditors, believing that their liens attached to the 118–Acre Sub–Parcel, did not object to the East 140 Parcel Sale. If Talmo had asserted a valid claim of homestead with respect to the 118–Acre Sub–Parcel at the outset of the case, all unsecured creditors and judgment lien creditors likely would have considered the same strategies that the Trustee would have considered if a valid exemption had been claimed earlier.

### C. Effect of Talmo's Failure to Claim Exemption on Benlate Settlement Approval.

Until filing the Amendment, Talmo had not disclosed his belief that he has individual causes of action against the RWT Corporations arising from the use of Benlate on the Property. He now claims to have such causes of action, and that his recovery on them is not property of the estate, on the theory that the ability to claim the 118–Acre Sub–Parcel as exempt means that causes of action relating to such property also are exempt. Thus, not only is Talmo's exemption claim on the 118–Acre Sub–Parcel new, he also has now disclosed for the first time exempt individual claims against the Settlement Proceeds. It is hard to view this exemption claim as anything other than a recently contrived effort to achieve his previously unsuccessful goal of keeping the Benlate Settlement Proceeds for himself.

Had Talmo disclosed these claims and their alleged exempt status sooner, the creditors may have acted differently. The Court and the creditors considered the merits of the Settlement Motion on the basis that the full benefit of the Settlement Proceeds, after taxes, would be available to Talmo's estate. If Talmo had disclosed that he would later seek to assert claims against the RWT Corporations with respect to their use of Benlate, and that he would seek the benefit of such claims for himself personally by asserting a homestead exemption with respect to the 118–Acre Sub–Parcel, the creditors and the Court would likely have reacted differently to the Settlement Motion.

For instance, Talmo testified that he did not disclose the Benlate Litigation in his schedules because the plaintiffs in the litigation were the RWT Corporations, not Talmo personally. Paul McMahon, counsel for two large unsecured creditors, testified that he would have attacked Talmo's credibility regarding his failure to provide earlier disclosure of the Benlate Litigation had Talmo disclosed an intent to claim for himself a portion of the proceeds as exempt. (TE–42). At a minimum, the settlement offer would have been scrutinized more carefully, the potential claims of Talmo against the RWT Corporations would have been examined, and the release of DuPont by the RWT Corporations, including the release of any contribution claims, would have been questioned. To allow the Amendment at this time would, therefore, cause prejudice to Talmo's estate and his creditors.

In sum, Talmo's creditors and estate were prejudiced by Talmo's failure to claim a homestead exemption at the outset of his Chapter 11 case or shortly thereafter because, as Talmo and his counsel intended, the inclusion of the 118–Acre Sub–Parcel as an asset of Talmo's estate precluded parties from taking certain litigation positions with respect to conversion of the case, stay relief, approval of the Benlate Settlement, and disposition of property after conversion. Moreover, the creditors and estate were prejudiced because the inclusion of the 118–Acre

Sub–Parcel as an estate asset kept the case out of liquidation for a longer period of time than it would have been otherwise, so that creditors did not receive distributions on their claims as the Chapter 11 estate continued to accrue costs and expenses. This prejudice justifies the disallowance of the Amendment under the standard described in *Doan.*

### TALMO'S BAD FAITH

■■■ Bad faith is a separate ground for disallowing an amendment to schedules, independent of the prejudice issue. While prejudice focuses on the effect on other parties in interest, the focus here is on the debtor's purpose—if the delay in amending his claimed exemption was deliberately intended to gain an economic or tactical advantage, at the expense of creditors and the interests of the estate, then the Court will find bad faith sufficient to disallow the Amendment. Talmo's pattern of conduct, both while in Chapter 11 and after conversion of the case to Chapter 7 liquidation, demonstrates that he is acting in bad faith in seeking to make the Amendment.

Upon filing his original schedules, Talmo made a conscious decision, after consulting extensively with his attorneys, to limit his homestead exemption claim to the 30–Acre Sub–Parcel in order to preclude or at least discourage creditors, particularly the FDIC, from pursuing certain litigation strategies in his Chapter 11 case. This decision, by itself, is not in bad faith. Thereafter, Talmo made a conscious decision, again after consulting extensively with his attorneys, to dedicate the assets of his companies to the satisfaction of his creditors' claims to successfully defend the Initial Motion to Convert. This decision also, by itself, is not in bad faith.

However, the deliberation and timing underlying Talmo's decision to file the Amendment, particularly in light of his actions and statements during the course of the Chapter 11 case, demonstrate clearly and convincingly that the Amendment is in bad faith. Talmo, after becoming aware of an offer on the East 140 Parcel, called a meeting of his present and former attorneys to discuss claiming the 118–Acre Sub–Parcel as exempt homestead,

since it appeared that the FDIC Mortgage would be satisfied from the proceeds of the East 140 Parcel Sale.

At this meeting, Talmo not only decided to file the Amendment, he also decided to delay filing the Amendment until after the East 140 Parcel Sale. In fact, it was not until the day that the Court signed the order approving the sale—three days after the hearing—that Talmo filed the Amendment. These facts alone demonstrate that the Amendment was filed in bad faith. Other events in his Chapter 11 case also evidence Talmo's bad faith, in particular his failure to disclose the existence of the Benlate Litigation and determination to keep the Settlement Proceeds, notwithstanding his pledge only a couple of months earlier that the assets of the RWT Corporations would be available to satisfy creditors' claims.

■■ Talmo cites to several cases allowing debtors to amend their exemption claims well after the start of a case. *Magallanes,* 96 B.R. 253; *Kobaly,* 142 B.R. 743; *Myatt,* 101 B.R. 197; *In re Drake,* 39 B.R. 75 (Bankr. E.D.N.Y.1984). All of these cases are dissimilar factually in several respects, but one point of distinction stands out—Talmo did not simply exclude an asset out of neglect or mistake. Rather, he deliberately, and after substantial consultation with counsel, chose to exclude the property in question from the property claimed as exempt to pursue strategic goals in his Chapter 11 case. No case cited by Talmo or found by the Court involved a similar fact pattern in which a debtor knowingly and intentionally included an asset in his estate for strategic purposes and then sought to exclude it when his plan failed. This "now you see it, now you don't" exemption strategy cannot be permitted.

Talmo made a conscious, knowing, and voluntary decision upon filing his original schedules not to claim the benefit of any available homestead exemption with respect to the 118–Acre Sub–Parcel. This decision was made for the express purpose of preempting litigation strategies of creditors and the Trustee. Talmo's initial decision not to claim the benefit of any homestead exemption with respect to the 118–Acre Sub–Parcel, his fail-

ure to seek to amend his schedules at any time during his Chapter 11 case, his express dedication of all his assets except the 30–Acre Sub–Parcel in order to continue his Chapter 11 case and avoid conversion to a liquidation, and the timing and circumstances of his decision to make the Amendment all bolster the Court's conclusion that the Amendment is in bad faith.

## TALMO'S CONCEALMENT OF ASSETS

The Court may also disallow an amendment to schedules if the debtor has attempted to conceal from creditors the assets that the debtor now seeks to claim as exempt. *Yonikus*, 996 F.2d at 873, *citing Doan*, 672 F.2d at 833. As discussed earlier, Talmo concealed from the Court, the estate, and his creditors both the existence of the Benlate Litigation as well as his belief that he has causes of action against the RWT Corporations or DuPont that may be brought on his own behalf. The existence of the Benlate Litigation was not disclosed until Talmo's bankruptcy counsel learned of the settlement through the lawyer handling the litigation for the RWT Corporations, and even then Talmo did not disclose his purported individual claims until filing the Amendment. Whether or not Talmo's attempts to conceal these assets were successful, Talmo's actions constituted concealment relevant to this Court's decision to strike the Amendment.

## CONCLUSION

Talmo's strategy in his Chapter 11 case was to disclose as little as possible, offer creditors as little as possible, and keep as much as possible for himself. When creditors attacked the completeness and valuation of assets in his original schedules,[9] and later discovered the existence and value of the litigation against DuPont, Talmo claimed innocent mistake, misunderstanding, or bad advice from counsel to excuse his actions. To stay alive in his effort to reorganize, he added these assets to the reorganization pot and persuaded the Court not to convert the

case when creditors first sought that relief in March of 1994.

Now, having failed to confirm a plan, he wants to take a valuable portion of these previously committed assets back from his creditors. That is not how the game is played. Talmo "anted up" to begin his Chapter 11 case. He put more money into the hand as the game continued. He lost the hand and now wants to take back his bets. That doesn't happen in poker; it will not happen in this bankruptcy case.

The Court finds and concludes that Talmo's Amendment to his bankruptcy schedules to claim as exempt the 118–Acre Sub–Parcel of the West 160 Acres and causes of action and claims against DuPont and the RWT Corporations in connection with the Benlate Settlement should not be allowed because: (1) the Amendment would prejudice the Trustee and creditors of his estate; (2) the Amendment is made in bad faith; and (3) Talmo has concealed assets of the estate. Therefore, it is—

**ORDERED** as follows:

1. The objections to the Debtor's amended claim of exemptions are sustained, to the extent they are based on the timing of the amendment; to the extent they are based on the substantive entitlement to the exemptions, the objections are denied as moot;

2. The amendment to schedules filed by the Debtor on February 24, 1995 is stricken;

3. Pending objections to other claimed exemptions listed in the Debtor's initial schedules will be resolved after trial set for September 11, 1995.

**DONE AND ORDERED.**

---

**9.** For example, Talmo scheduled his 100% interest in Funding, Inc. as having "nominal value" when in fact the corporation owned Can–Do

Foliage, Inc., owner of 1400 acres of land in Tennessee with significant equity, and RWT Nursery, which also had value.