In re Tamara M. MARKEY, Debtor.

Randall L. Seaver, Trustee, Plaintiff,

v.

Tamara M. Markey, now known
as Tamara Markey Hancel,
Defendant.

Bankruptcy No. 02–93495.
Adversary No. 05–3269.

United States Bankruptcy Court,
D. Minnesota.

Oct. 29, 2007.

Michael S. Dove, Gislason & Hunter LLP, New Ulm, MN, Randall L. Seaver, Roger Seaver, Fuller Seaver & Ramette, Burnsville, MN, for Plaintiff.

Michael J. Iannacone, Iannacone Law Office, Lake Elmo, MN, for Defendant.

## MEMORANDUM DECISION AFTER TRIAL [ADV 05–3269] AND ORDER ON TRUSTEE'S OBJECTION TO DEBTOR'S AMENDED CLAIM OF EXEMPTIONS [BKY 02–93495]

GREGORY F. KISHEL, Bankruptcy Judge.

This Chapter 7 case and adversary proceeding came on before the Court on a joint calendar setting, for trial in ADV 05–3269 and for an evidentiary hearing on an objection to the Debtor's amended claim of exemptions in BKY 02–93495. The Plaintiff and objector ("the Trustee") appeared personally and by his attorney, Michael S. Dove. The Defendant ("the Debtor")[1] appeared personally and by her attorney, Michael J. Iannacone. The following memorializes the decision on both proceedings, which is based on the evidentiary record and the briefs and oral argument submitted by counsel.

### INTRODUCTION[2]

The Debtor filed a voluntary petition for relief under Chapter 7 on November 6, 2002. She was represented by David F. Frundt, Esq., for the filing and the resultant bankruptcy case.

When the Debtor filed for bankruptcy she held ownership interests in two parcels of real estate in Martin County, Minnesota. One was the house in the town of Ceylon that she occupied as her home; the other was a rental property. She also owned various items of personal property. In her original Schedule C, filed

---

1. At trial, the Debtor testified that she had remarried since the commencement of this litigation; hence, the amendment of the caption for this adversary proceeding.

2. This section contains several findings related to transactions, events, and court proceedings. As points of fact, these are uncontested; most of them are derived from the parties' pre-trial stipulation of fact [Dkt. No. 34].

with her petition, she claimed exemptions for her interests in both parcels of real estate and in various described personalty. She elected the exemptions available under federal law, 11 U.S.C. § 522(d).[3] She assigned specific values to the claimed exemptions, as the schedule's form required. Among other things, she noted a "Value of Claimed Exemption" of "0.00" for the house she occupied. This figure was the same as the value she had assigned to the property as a whole, in her Schedule A. She did not schedule any interest in a right to receive income tax refunds, as an asset or as exempt property.

The Trustee was duly appointed to administer the estate in the Debtor's bankruptcy case. He convened the meeting of creditors under 11 U.S.C. § 341 on December 19, 2002.

The colloquy at the meeting of creditors went into the issues of the Debtor's equity in the real estate and her right to receive income tax refunds. It emerged that the Debtor had not yet filed returns for tax years 2001 and 2002, but had had amounts for taxes withheld from her wages in both years. The Debtor stated that she believed she was entitled to tax refunds for both years. The Trustee then asked her to file her returns promptly, and to refrain from cashing any checks for refunds that she received. He specifically instructed her to send the checks to Frundt, "while we figure[d] out who's entitled to it." The Debtor agreed to do this.

The Debtor received a discharge under Chapter 7 in BKY 02–93495 on February 19, 2003.

After some exchange of correspondence with Frundt on the issue of the value of the Debtor's home, the Trustee objected to the Debtor's claim of exemption in that asset.[4] He did so to obtain an adjudication under *In re Soost,* 262 B.R. 68 (8th Cir. BAP 2001), that the value to be allowed as exempt was limited to the specific number in the recitations in the Debtor's original Schedule C. The Debtor did not respond to the objection. An order sustaining the Trustee's objection was entered. In pertinent part, it determined that "[t]he Debtor's claimed exemption of a homestead . . . in the amount of '0.00' entitles her to nothing."

As it then came to be known to the Trustee, in several stages of revelation:

1. On November 22, 2002, shortly after her bankruptcy filing, the Debtor had been granted a judgment from the Martin County, Minnesota District Court, determining that a mortgage of record against the Debtor's home was not valid or enforceable. (The reason was that the mortgage had been previously granted during the Debtor's marriage to one Edward R. Chojnacki, but the Debtor had not signed the mortgage instrument.) That judgment was later affirmed by the Minnesota Court of Appeals.[5] This had left the home free and clear of encumbrances. The Debtor had not listed or claimed

---

**3.** Minnesota is one of the minority of states that has not opted under 11 U.S.C. § 522(b)(2) to bar the application of the "federal exemptions" of § 522(d) in bankruptcy cases.

**4.** The Debtor's counsel had stipulated to an extension of the Trustee's time to file this objection.

**5.** *See Wells Fargo Home Mortgage, Inc. v. Chojnacki,* 668 N.W.2d 1 (Minn.Ct.App.2003). The trial court's judgment had been rendered in the context of a foreclosure-by-action of the mortgage, and the Debtor received her relief on her pleaded counterclaim.

as exempt any interest in this lawsuit, in her original bankruptcy schedules. The Trustee first became aware of the foreclosure action before the meeting of creditors, when Frundt disclosed it to him in a letter dated November 14, 2002. In a later letter dated December 11, 2002, Frundt disclosed for the first time that "the validity of [the] Mortgage held by Wells Fargo Bank" was also at issue in the foreclosure action. He stated that "regardless of the outcome, this matter will need to be appealed." At the meeting of creditors, the Trustee first learned about the entry of the state court's judgment.

2. In May, 2004, the Debtor obtained a loan in the principal amount of $100,000.00 and granted a mortgage against her home to secure it. This occurred after the entry of the order sustaining the Trustee's objection to the Debtor's claim of homestead exemption. In the meantime, the Trustee had taken no action to administer the non-exempt value in the home. The net proceeds of the loan, in the amount of $91,635.53, were disbursed to the Debtor directly or to third parties on the Debtor's account.

3. The Debtor filed her income tax returns for 2001 and 2002 by January 31, 2003. She did not advise the Trustee that she had completed and filed the returns. After that, she received corresponding tax refunds, in early 2003. She did not report her receipt of the refunds to the Trustee. She did not turn the checks or any direct-deposited refunds over to the Trustee. She cashed the checks or retained all direct-deposited funds, and spent the full amount of the proceeds.

4. When she filed for bankruptcy, the Debtor had owned a large snowblower attachment, capable of use when installed on a tractor. She had not noted her ownership of this asset anywhere in her bankruptcy schedules. After the meeting of creditors in her case, she sold it for $1,800.00. She then spent the proceeds. She did not report the sale or her receipt of the proceeds to the Trustee; nor did she turn the proceeds over to the Trustee.

5. When she filed for bankruptcy, the Debtor had owned a moped or motorcycle of the Indian brand, an Amana-brand freezer, a satellite dish and receiver, and a horse trailer. She also had had an open savings account at State Bank of Ceylon. She had not disclosed her ownership of any of these assets in her bankruptcy schedules.

After taking an examination of the Debtor under Fed. R. Bankr.P.2004, the Trustee commenced ADV 05–3269. Via his complaint, he sought a revocation of the grant of discharge to the Debtor. The stated grounds were that the Debtor had acquired property of the bankruptcy estate (in the form of the proceeds of the mortgage-secured loan, the tax refunds, and the snowblower sale, plus certain tangible personal property), and after failing to report these acquisitions to the Trustee she had failed to surrender the proceeds to him, all knowingly and fraudulently. He also sought relief styled under the turnover provisions of 11 U.S.C. § 542, to recover the subject assets or their value from the Debtor.

For the defense of this adversary proceeding, the Debtor engaged new counsel, Michael J. Iannacone, Esq. He filed an answer. Through it, the Debtor generally

denied that she had acted with fraudulent intent. As an affirmative defense, she asserted that she had "reasonably relied on the advice of her bankruptcy counsel," "at all times in her dealings with the bankruptcy trustee."

After a scheduling conference and the issuance of a scheduling order, the Trustee filed a motion for summary judgment. The Trustee and the Debtor's counsel stipulated to a month's continuance of the hearing on it. Five days prior to the date of the continued hearing, Iannacone filed amended schedules in BKY 02–93495. Under them, the Debtor now claimed "100% of value exempt" as to her home, reciting $92,000.00 as the value of the property as a whole and as the value of her claimed exemption. She now cited Minnesota law, Minn.Stat. § 550.01–.02, as the legal basis for her claim of exemption. One day before the hearing, Iannacone filed a response to the Trustee's motion.[6]

The Trustee objected to the amended claim of exemptions. At a preliminary hearing, the Court and counsel agreed that an evidentiary hearing on that proceeding would be consolidated with the trial in ADV 05–3269.

In the ruling on the motion for summary judgment, the Court made a number of findings as to uncontested facts, and legal conclusions as to those facts. First, it was held that the Debtor's dissipation of some of the cash proceeds from the tax refunds and the mortgage loan disbursement, and the full proceeds of the sale of the snowblower attachment, were failures to surrender property of the estate that were actionable under 11 U.S.C. § 727(d)(2). However, the record presented triable fact issues as to the Debtor's knowledge and/or intent when she received and dissipated these funds. Thus, the Trustee was not entitled to judgment as a matter of law and his motion was denied. These were the only fact issues reserved for trial in ADV 05–3269.[7] Certain legal issues under the Trustee's remaining turnover requests were reserved for determination after the ruling on the viability of the Debtor's amended claim of exemptions.[8] The Court specifically reserved the issue of whether the Debtor's discharge should be revoked on account of her disposition of the assets subject to these remaining turnover requests, even if the Debtor's amended claims of exemption were allowed.[9]

When these two matters came on for a joint hearing, the fact issues basically came down to the Debtor's state of mind, i.e., her knowledge and intent, at certain times relevant to her receipt and disposition of the assets in question, and then in relation to her amended claim of exemp-

---

6. This late filing violated Loc. R. Bankr.P. (D.Minn.) 9006–1(c). The Debtor's counsel has never come forward with an excuse for the tardiness.

7. The order granted partial summary judgment to the Trustee on some of his turnover requests, as they pertained to the value of the tax refunds and the snowblower attachment. He was granted a money judgment to the extent of all value that the Debtor had not claimed as exempt in the amended schedules that she had filed in August, 2006.

8. These reserved issues went to the assets that the Debtor now purported to claim as exempt

via the late-filed amended Schedule C. Those assets consisted of a portion of the value of the tax refunds plus the home equity that the Debtor had "withdrawn" via the mortgage-secured loan. If the Debtor's amended claims of exemption were allowed, and that allowance were given effect as of the Debtor's bankruptcy filing, she would have no obligation to make the estate whole for her post-petition dissipation of the underlying proceeds.

9. See Term 18, Order of November 30, 2006.

tions. All of the legal issues would proceed from the outcome on these facts.

## DISCUSSION[10]

When she filed for relief under Chapter 7, the Debtor was an ordinary consumer, not engaged in business before her bankruptcy filing or at the time of it.[11] At that time, the Debtor's debt and asset structures had a few complications, but nothing too far out of the ordinary; her situation was quite modest, in the abstract. However, the initial services she had received from the attorney she retained for bankruptcy failed to meet her obligations as a debtor at the outset of the case, or to fully protect her rights in that status. Then, as issues over her assets and their status arose, she got advice that was increasingly bad in parts. In general, things started off somewhat poorly and they got worse. After receiving more, and even more wrong-headed, advice from counsel, the Debtor did some things with her assets that prejudiced her own rights in bankruptcy, not to mention those of the bankruptcy estate. In other ways she went ahead on her own motion, heedless of the Trustee's clear directions. Time passed after that, accumulating to several years. The Trustee did not consistently pursue the estate's interests with the most dogged of dispatch, but ultimately that does not matter. Several times in a staggered series of events, the Debtor violated her obligations as a petitioner in bankruptcy, and materially harmed the interests of her creditors. She did so knowingly and without disclosure to the Trustee. For that she must lose the benefit of her bankruptcy filing, and her discharge of debt must be revoked. She also forfeits the right to amend her earlier claims of exemption, and hence may not upset the settled effect to be given to her past actions in connection with the bankruptcy case. The reasons are as follows, set forth separately for each proceeding and as to each category of subject asset.

I. *Trustee's Adversary Proceeding
 for Revocation of Discharge:
 11 U.S.C. § 727(d)(2)*

In ADV 05–3269 the Trustee requests judgment against the Debtor to undo the single, central personal benefit that she sought by filing for bankruptcy. As invoked here, this remedy is governed by 11 U.S.C. § 727(d)(2). That statute provides:

(d) On request of the trustee, . . . and after notice and a hearing, the court shall revoke a discharge granted under [11 U.S.C. § 727](a) . . . if—

. . .

(2) the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee . . .

As noted *supra* at pp. 600–02, the only fact issue tried on this request for relief was whether the Debtor had acted fraudulently when she disposed of the value of assets, or assets themselves, as they fell into four different categories.

---

**10.** This section will contain further findings of fact, plus conclusions of law, in a mixed format. The findings of fact will go to more precise aspects of the events and transactions at issue.

**11.** At trial, the Debtor recited the "substantial debt due to" her divorce proceedings as the reason why she filed for bankruptcy. She testified to having been employed as a herdsperson in a large hog farm, responsible for the care of sows during farrowing time.

There is little case law in general, and none from the Eighth Circuit Court of Appeals, that delineates the essence of "fraudulence" in a debtor's post-petition dissipation of assets, for the purposes of § 727(d)(2). To harmonize the treatment of statutory provisions with corresponding terminology, the Eighth Circuit's analysis for the existence of fraud under other Code provisions should be considered. That test incorporates the concepts of the common law—requiring the making of a false representation of fact with fraudulent intent, reliance by the recipient, and resultant harm. *In re Van Horne,* 823 F.2d 1285, 1287 (8th Cir.1987) and *In re Ophaug,* 827 F.2d 340, 343 (8th Cir.1987) (between the two, identifying elements of "actual fraud" under 11 U.S.C. § 523(a)(2)(A)); *In re Lauer,* 371 F.3d 406, 413 (8th Cir.2004); *In re Dallam,* 850 F.2d 446, 449 (8th Cir.1988). *See also In re Preece,* 367 B.R. 647, 652 (8th Cir. BAP 2007).[12]

■ Under that analysis, a fraudulent state of mind is proved up where the debtor intended to induce reliance by knowingly making a false statement or promoting a false pretense. *In re Moen,* 238 B.R. 785, 787 (8th Cir. BAP 1999); *In re Gibson,* 149 B.R. 562, 572 (Bankr.D.Minn.1993). Put more colloquially, a court must be able to find that the debtor intended to put one over on another party, when the subject matter of the debtor's representation or pretense is material to a decision or action

that the recipient-party may make or take. The notion is that the debtor used a lie to lever the other party into action or to forbear from action. This finding may be made on direct evidence or by way of inference.

■ Strictly speaking, there is no overt act of inducement to a trustee, preceding a clandestine disposition of estate assets that is to be redressed by the sanction of § 727(d)(2). Perforce, the debtor's act is coupled with a failure to advise, notify, or obtain permission from the trustee. Its consummation is enabled by the pretense, the crafted semblance,[13] that it is *not* being effected; the trustee either is unaware of the existence of the assets [14] or does not know of the debtor's retention/acquisition and unauthorized disposition of them.[15] The resultant harm lies in the trustee going on his or her way in the administration of the estate, without knowledge of the debtor's usurpation of value until after the assets are gone.

■ In light of all this, a debtor's conduct is "fraudulent" under § 727(d)(2) where the debtor is aware of the wrongfulness or impropriety of the disposition, deliberately fails to make disclosure to the trustee, and harbors a simple intent to go ahead in the disposition, whether it is directly for the debtor's benefit or not.

■■ Under this framework, the corollary case law authority on 11 U.S.C. §§ 727(a)(2)(A) and (B) [16] makes possible

**12.** The Eighth Circuit's early rulings are very much in line with the later-issued analysis of the United States Supreme Court, in *Field v. Mans,* 516 U.S. 59, 70–72 and n. 9, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

**13.** As to the nature of a false pretense, *see In re Anderson,* 181 B.R. 943, 950–951 (Bankr. D.Minn.1995).

**14.** This flies in the face of the debtor's statutory duty to disclose them, under 11 U.S.C. § 521(a)(1).

**15.** This violates the debtor's statutory duty to cooperate with the trustee in the administration of the estate, under 11 U.S.C. § 521(a)(3).

**16.** When it comes to a debtor's intentional post-petition dissipation of assets of the bankruptcy estate, two provisions of 11 U.S.C.

the affirmative defense that the Defendant asserts here: reliance in fact on the advice of counsel may prevent a finding of actual knowledge of impropriety, at least "if the advice is reasonable" and the attorney was fully-informed before giving it. *In re Sendecky*, 283 B.R. 760, 765 (8th Cir. BAP 2002) (citing *In re McLaren*, 236 B.R. 882 (Bankr.D.N.D.1999)). *See also In re Schaefer*, 331 B.R. 401, 423 (Bankr. N.D.Iowa 2005); *In re Geller*, 314 B.R. 800, 808 (Bankr.D.N.D.2004); *In re Craig*, 195 B.R. 443, 452 (Bankr.D.N.D.1996).

This defense, however, does not wash as to the two categories of assets for which the Debtor received some advice from Frundt. As to those categories, the Trustee met his burden of proof. On that basis, he is entitled to judgment.

### A. Entitlement to Tax Refunds for Tax Years 2001 and 2002

 When the Debtor filed for bankruptcy she was entitled to receive refunds for tax years 2001 and 2002.[17] It is beyond dispute that her full entitlement to the 2001 refund and a pro rata share of her right to the 2002 refund became property of her bankruptcy estate, at that moment. E.g., *In re Benn*, 491 F.3d 811, 813 (8th Cir.2007); *In re Law*, 336 B.R. 780, 782 (8th Cir. BAP 2006). Once there, these assets were to remain, until they exited the estate via the allowance of a claim of exemption. *In re Kasden*, 209 B.R. 239, 244 (8th Cir. BAP 1997).[18] As property of the estate, they were subject to the Trustee's full control and administration; the Debtor had no right to do anything with them or their value. *In re JZ L.L.C.*, 371 B.R. 412, 418 (9th Cir. BAP 2007); *In re Schmidt*, 362 B.R. 318, 325 (Bankr. W.D.Tex.2007). *See also In re Harrison*, 314 B.R. 751, 753 (8th Cir. BAP 2004); *Jones v. Harrell*, 858 F.2d 667, 669 (11th Cir.1988) (trustee has sole authority to settle and release pre-petition cause of action that is property of bankruptcy estate). The Trustee's instruction to the Debtor at the meeting of creditors reflected this legal structure of right and control, via an unadorned and unmistakable directive that the Debtor acknowledged on the spot.

Yet, when the Debtor received the refunds only a few months later, she did not comply with the Trustee's request as to his immediate goal, physically depositing the refund checks or the value of any direct-deposited refunds[19] with Frundt, her at-

§ 727 may be applied to deprive a debtor of a general discharge for making a "fraudulent" post-petition disposition of assets of the estate: §§ 727(a)(2)(B) (permitting denial of discharge before the court grants one) and (as invoked here) 727(d)(2) (permitting revocation of discharge after granted by the court). 11 U.S.C. § 727(a)(2)(A) permits denial of discharge before it is to be granted, for a fraudulent pre-petition disposition of assets that a debtor made in contemplation of bankruptcy. There, the intent accompanies an act that *later* frustrates "an officer of the estate charged with custody of property under" the Bankruptcy Code, i.e., the trustee in the bankruptcy case that is commenced *after* the act of disposition. *In re Searles*, 317 B.R. 368, 378–379 (9th Cir. BAP 2004) (noting "reciprocal" theories of 11 U.S.C. §§ 727(a)(4)(A) and 727(d)(2), as to continuing consequences to

debtor's right to discharge from failure to disclose assets in original schedules and via amendment).

17. The Debtor may not have been aware of this when she filed, but post-petition events (her filing of returns and the taxing authorities' processing of them) later showed it.

18. The other ways in which an asset leaves the estate are via an actual abandonment by the trustee pursuant to 11 U.S.C. § 554(b), or a deemed abandonment by operation of 11 U.S.C. § 554(c). Neither of those occurred here.

19. It is not entirely clear from the record whether the Debtor received the refunds in the form of checks or via direct deposit. Her testimony suggested that the taxing authori-

torney. Nor did she permit the Trustee the outcome he specifically identified to her, an orderly sorting-out of the entitlement to the value of the refunds.[20] But, it is clear that the Debtor remembered what the Trustee had said at the meeting of creditors, at the time she received the refunds.[21]

The Debtor gives only one excuse for not following through on the Trustee's request, literally and term-for-term, and only one explanation for her knowing dissipation of the funds: she was relying on Frundt's advice. He gave this advice in his letter of June 26, 2003 to her:

I have completed my review of your file to determine whether or not you can use your 2002 tax refund to purchase a new vehicle at this time. Although we did not claim your tax refund as an exempt asset, I believe that you have plenty of room under the exemptions to do so if the need should arise. Therefore, it is okay to use the refund to purchase a new vehicle at this point in time.

It is not clear what was said during the consultation between the Debtor and Frundt that prompted this letter. However, between that and the letter, this was the only contact the Debtor had with either Frundt or the Trustee on the matter of the tax refunds before she spent them. It was also the only advice she had from Frundt before she spent them.

For a number of reasons, this lone advisory does not furnish a legally-cognizable excuse for her dissipation of the estate's assets. Nor does it prevent a finding that she acted fraudulently when she did dissipate them. The reasons are as follows:

1. The Debtor received her 2001 tax refunds at some point in February, 2003, and her 2002 tax refunds on, respectively, February 11 (state) and February 14 (federal). The Debtor received direct deposit of, or deposited, all of these funds in her personal checking account soon after she received them. At the time she knew she "was supposed to give" the full amount of the refunds to Frundt.[22]

2. The Debtor did not purchase the automobile until June or July, 2003; and even then, she only used $1,500.00 out of a total of over $8,800.00 in the proceeds of the two years' refunds. (She financed the

---

ties issued her checks due to the pendency of the bankruptcy case, though she would have received the refunds via direct deposit in the ordinary course as a result of e-filing the returns. At trial nobody pursued this point to clarify it, but it is not material. The amounts of the refunds were relatively substantial: a total of $3,743.00 for tax year 2001, and $5,053.00 for tax year 2002.

**20.** The need for the latter process was all the more salient, due to her omission of the refunds from her asset and exemption schedules alike.

**21.** During her testimony at trial, the Debtor did not state this in so many words. But this is the only reasonable inference from the fact that she did not immediately treat the refunds as her own property, by cashing the checks,

but called Frundt to tell him that she had received them.

**22.** The Debtor testified "I was supposed to give" the refunds to Frundt. She did not link this awareness to a particular point in the sequence of events; but it is reasonably inferred that she knew she was to do this at the times of receipt and deposit. (She stipulated to the dates of receipt, and her checking account records are in evidence. Though she attempted to deny some of the content of the fact stipulation during her testimony, she is bound by the stipulation.) That inference is made. Among other things, the Debtor admitted in testimony that she "had no idea why [she] did that," i.e., not turn the checks themselves over to Frundt, immediately on receipt, without posing questions to him about the immediate right to the funds.

balance of the $10,000.00 purchase price with a loan.) The rest of the proceeds were gone by the time the Trustee starting inquiring into the matter of the refunds. The Debtor used the balance of the proceeds for her own living expenses or for other purposes.[23]

3. In any event, Frundt's advice went only to the disposition of the 2002 refund. In his testimony, Frundt acknowledged having drawn a distinction between the 2001 refund and the 2002 refund in his own thinking; but he maintained that he had never given her any advice as to what to do with the 2001 refund, and that he never inquired of her what she had done with it. The Debtor never testified to contrary effect; so the uncontroverted evidence compels a finding in accordance with Frundt's testimony.

4. The Debtor did not report her receipt of the refunds to Frundt for several months after she received them, and only after she had started to consider the purchase of an automobile.[24]

5. Though Frundt did communicate to the Debtor in writing his conclusion that her proposed use of a portion of the refund proceeds was permissible, her reliance on the facial wording of this advice was unreasonable and unfounded:

a. The Debtor admitted at trial that there had been "no confusion" about "what [she] had to do," under the Trustee's instruction.

b. Frundt was not telling her that he had conferred with the Trustee and obtained his consent before giving her his advice, or that he had otherwise worked with the Trustee to "figure out who's entitled to" the funds.[25] As found earlier, the Debtor knew that that was a prerequisite to the negotiation of the checks or a final use of the funds by anyone.

c. At trial, the Debtor acknowledged that she had understood the Trustee's role to be one of "overseeing the case, kind of like a judge." As technically inaccurate as this wording was, it clearly reflected her awareness throughout, that the Trustee had significant power and responsibility in the processing of her bankruptcy case. This put her on reasonable notice of the need to be utterly careful in dealing with him, while he administered the assets of the estate.

**23.** She admitted at trial that she "probably spent it." She made no effort to itemize the expenditure.

**24.** The Debtor testified to something different, that it "took a long time to get the checks" from the taxing authorities due to the pendency of the bankruptcy case, and she then called Frundt within a week, to have him then tell her "make copies of [the checks], and then you can use the money." Particularly as it pertains to the timing of events, this story is not credible. There are no entries in Frundt's time records to correspond to the sequence of events to which the Debtor testifies; the entries that are there do support the findings as made. The sending of the June 26 letter, and its content, fly directly in the face of this testimony. Plus, during her testimony the Debtor expressed a certain amount of confusion and equivocation regarding the related facts, generally detracting from the credibility of her testimony on this specific issue.

**25.** In point of fact, Frundt testified that he "did not remember" consulting the Trustee. The Trustee testified that Frundt had not. On this evidence, only one finding is possible. Frundt did not speak with the Trustee on the matter of the income tax refunds, before his conference with the Debtor regarding them.

d. By contrast, the Debtor stated at trial that Frundt had never explained the Trustee's role to her; and that though he had explained to her that under law "there were some assets you could keep, others would go to creditors," he had not told her whether she herself "would lose anything or not" in her case. The complications over her failure to schedule rights to tax refunds emerged early in the case, and several other issues rapidly cropped up. Given that, the Debtor knew enough to reasonably prompt suspicion that Frundt's earlier counseling was deficient, and that he might not adequately understand the bankruptcy process. With her overt appreciation of the Trustee's position of relative power, all of the circumstances imposed a duty on her to make further inquiry directly to the Trustee. She failed to do that.

Given these findings and conclusions, the Debtor's failure to disclose her receipt of the tax refunds and her failure to turn their non-exempt value over to the Trustee was fraudulent, on two different levels.

In the first place, the Debtor knowingly failed to account for and to surrender control over the value of the tax refunds, at the point when she deposited them into or retained them in her bank account rather than complying with the Trustee's directive.[26] She contemporaneously knew that she had no right to exercise even that degree of control over the funds, and yet she went ahead and did it. By not surrendering the refunds to Frundt, and by depositing them or retaining the direct deposit of them in her bank account, and doing that without consulting Frundt or the Trustee, the Debtor acted "fraudulently" within the meaning of § 727(d)(2).

When it came down to her specific acts of dissipating the funds—a series of component failures "to deliver or surrender such property to the trustee"—her asserted defense of "advice of counsel" applies only to her use of $1,500.00 toward the auto purchase. This was the only disposition that Frundt told her was "okay." As to that transaction, Frundt's advice simply was not "reasonable" on its face, even to a layperson unlettered in the law. It directly contradicted the instruction of someone that the Debtor recognized to be a significant authority figure in the bankruptcy process, as an officer of the estate. Frundt's communications to the Debtor lacked any indication that he had obtained the Trustee's leave to tell her that. It flew entirely in the face of what the Debtor knew her obligation to be, to immediately surrender control of the funds upon receipt and in any event to refrain from spending them herself.

The record permits only one inference as to the ultimate fact: the Debtor knew that following Frundt's advice would be improper and wrongful, as to any funds so used. That knowledge imposed a duty on her, to make direct inquiry of the Trustee. This would have afforded the Trustee a "report [of] the acquisition of ... such property," which would have headed off the debacle that followed. The Debtor failed to do that. Her use of this $1,500.00 component of the refunds' value was a conclusive failure to "deliver or surrender such property," that in itself was "fraudulent" within the meaning of § 727(d)(2).

---

**26.** This augments the findings made earlier on the record regarding the "knowing" character of the Debtor's actions in general. She had received the Trustee's instructions barely six weeks before-and she still remembered them.

As to the balance of the money,[27] the Debtor apparently spent that over a period of weeks or months in the spring of 2003, before (and perhaps after) her automobile purchase. When she started withdrawing these funds from her bank account, she was fully on notice that she had no right to do that before she had settled with the Trustee over the matter of entitlement. She went ahead and exhausted the proceeds, without telling (or giving) the Trustee a thing. Given her knowledge, she acted "fraudulently" within the meaning of § 727(d)(2) in the way she disposed of the balance of this property of the estate, after she received it.[28]

Thus, the Trustee met the last element of his case for a revocation of the Debtor's discharge, considering this asset category alone; and he is entitled to a judgment against the Debtor under § 727(d)(2).

### B. Withdrawn Non–Exempt Equity in Real Estate Used as Home

The events concerning the Debtor's rights to tax refunds are such as to make one wince; but those relating to the real estate that she occupied as her home when she filed for bankruptcy are almost painful to recite.

 When she filed for bankruptcy, the Debtor's interest in that real estate passed into her bankruptcy estate, by operation of 11 U.S.C. § 541(a). E.g., *In re Wick*, 276 F.3d 412, 415 (8th Cir.2002); *United States v. Transport Admin. Servs.*,

260 F.3d 909, 913 (8th Cir.2001); *Whetzal v. Alderson*, 32 F.3d 1302, 1303 (8th Cir. 1994); *Stumpf v. Albracht*, 982 F.2d 275, 277 (8th Cir.1992); *In re Tri–River Trading, LLC*, 329 B.R. 252, 263 (8th Cir. BAP 2005). She then had the right to claim it as exempt from the estate, to the extent it was protected to her under applicable law. 11 U.S.C. § 522(b); *Taylor v. Freeland & Kronz*, 503 U.S. 638, 642, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992); *Abramowitz v. Palmer*, 999 F.2d 1274, 1276–1277 (8th Cir. 1993). In a bankruptcy case, a claim of exemption is asserted by noting the interest in property on Schedule C, "Property Claimed as Exempt," citing the legal authority for the claim of exemption, and identifying a "Value of Claimed Exemption" as well as a "Current Market Value of Property Without Deducting Exemptions." *See* 11 U.S.C. § 522(*l*); Fed. R. Bankr.P. 4003(a) and 1007(b)(1); and Official Bankruptcy Form 6, Schedule C.

In mid–2001, the Bankruptcy Appellate Panel for the Eighth Circuit ruled that a debtor under Chapter 7 who (as required) specifies a dollar-amount for the "Value Claimed Exempt" is allowed an exemption in the subject asset only to the extent of the identified value in the asset; "[t]he asset as a whole does not become exempt." *In re Soost*, 262 B.R. at 72. "Under the circumstances, the bankruptcy estate retains an interest in the subject asset because only a partial interest has been exempted by the debtor. . . . Thus, claiming an exemption in an asset does not neces-

27. As ruled earlier, the Debtor's "advice of counsel" defense applies only to her use of the $1,500.00 for the automobile purchase, because Frundt gave her no advice as to any other use of the funds.

28. None of this discussion addresses the substantive validity of Frundt's assumptions in advising the Debtor that she was free to buy a car with the tax refund proceeds, because his assumptions do not directly bear on the Debtor's intent. Nonetheless, it has to be ob-

served: it boggles the imagination to see an attorney holding himself out as competent to maintain a consumer bankruptcy case, blithely advising a debtor that she could convert assets already vested in the estate. Frundt seems to have had no clue that bankruptcy is a *creditor's* remedy where the circumstances merit, as well as a debtor's remedy, and the extent of each is fixed by the circumstances as they obtain when a given case is commenced.

sarily preclude administration of that asset by the trustee in bankruptcy." *Id.* This analysis applies as much to a claim of exemption in homestead real estate as it does to one in any other sort of asset. *Id.* *See also Hyman v. Plotkin,* 967 F.2d 1316 (9th Cir.1992).

When the Debtor filed for bankruptcy, she was residing in a home in the town of Ceylon, Minnesota, to which she held the legal title subject to a mortgage of record in favor of Wells Fargo Home Mortgage, Inc. As noted earlier, in her Schedule C she claimed an exemption for her interest in this real estate, of a value of "0.00." [29] To anyone even passingly conversant with bankruptcy law, an entry of this sort raises questions as to the intent behind the claim of exemption, exactly *what* it is that would be taken out of the estate by an allowance of the exemption claimed.[30]

So, the Trustee objected to the claim of exemption. He had the benefit of the Bankruptcy Appellate Panel's *Soost* decision as to the facial content of the Debtor's Schedule C. And, the bringing of the objection might force an early clarification of the Debtor's position on the exempt status of all of her other property-so he could

avoid putting effort into the recovery of assets only to have them subjected to disputes prompted by a later amendment of Schedule C. By the time the Trustee made his objection, he was aware of the decision of the Martin County District Court that freed the property from the Wells Fargo Mortgage; but the Debtor and Frundt had not taken any action to amend her Schedule C, to increase the value of her claimed homestead exemption by an amount corresponding to the value freed from the thrall of a record encumbrance in favor of Wells Fargo.

So, all told, the Trustee was not unreasonable in making his objection, to get an adjudication of the legal consequences of the contemporaneous status of the record and to force the Debtor's future intentions on the issue of exemptions.[31] To the Trustee's surprise, the Debtor and Frundt did not respond to his objection in any way, not even by the circuitous and slippery means of an eleventh-hour amendment of Schedule C. So the Trustee got what he asked for, an order that stated in nontechnical, layperson's language, that the Debtor then was "entitle[d] ... to nothing" in actual economic value, in her initial

---

**29.** The Debtor's Schedule A recited values of "0.00" for the unencumbered value and for the "Amount of Secured Claim" associated with this property. Her Schedule C recited the same figure for the secured claim.

**30.** Yes, there was no arithmetic incongruity among all of the recitations of value. But anyone looking at these documents from a perspective grounded in the real world would blink, shake his head, and wonder what was meant. Is it just "bare title" that the debtor seeks to retain? And what is to happen if the gross value of the asset turns out to be greater than the debtor assumes; did the debtor envision that as a possibility, and knowingly undertake the risk, or is something else at play?

**31.** And as any Minnesota practitioner of bankruptcy law knows, the election between using the state and the federal exemptions

usually turns on the potential value to be claimed exempt as homestead. The election has consequences beyond that: the value-limitation for a homestead exemption under Minn.Stat. § 510.02 is significant multiples greater than that under 11 U.S.C. § 522(d)(1); but because the Minnesota state exemptions lack a "wild-card" or "pour-over" exemption like 11 U.S.C. § 522(d)(5), they are significantly less flexible. Broadly stated, a debtor electing the Minnesota state exemptions under current law generally loses to the estate any interest in non-homestead real estate, plus the value of funds on deposit as of the date of the bankruptcy filing, some portion of the value of unpaid tax refunds, the nonexempt portion of wages owing, and other intangible assets held as of the filing.

bid to take her dwelling place out of the estate.

When she had reviewed her bankruptcy schedules with Frundt before she filed, the Debtor had noticed the zero-valuation assigned to her claimed homestead exemption. She then "kind of questioned it" to Frundt because "it didn't seem right." The record has no evidence as to what Frundt told her.[32]

When in mid-March, 2003, the Debtor received service of the Trustee's objection to her claim of homestead exemption, she called Frundt. She was "extremely upset" and asked "what was going on." Clearly, at that time she understood that the Trustee's objection could have some sort of serious implication for her homeownership. Contemporaneously, she believed that the sale value of the house was around $5,000.00 more than the amount of the debt that had been secured by the Wells Fargo mortgage.

Per the Debtor, Frundt's response was "don't worry about it." However, Frundt did nothing in response to the Trustee's objection, despite having told the Trustee four months earlier that he would "be filing an amendment with the correct amount [of value for the property itself] very soon to correct this error," i.e., the statement of "no value placed upon the homestead in this case" in the original schedules he had prepared.[33]

And so the order was entered. Its legal consequence was that all of the equity in the Ceylon house still reposed in the bankruptcy estate. In terms of abstract legal theory, Frundt knew this to a certainty.[34] More to the point of the issue at bar, the wording of the order was so plain that, again, the Debtor herself was put on notice that she had reserved no entitlement to the value of the equity in her homestead, from the scope of the assets that would be subject to the Trustee's administration.

None of this wreaked the damage, however; it only laid the foundation for it.

---

32. No one broached this issue with Frundt when he was on the witness stand. In any event, the Debtor went ahead to sign the Signature Declaration Page to verify her petition, statements, and schedules. At trial, she gave her reason for so proceeding, that she "relied on him [Frundt] to do that," i.e., to assemble the content of her schedules. But she also acknowledged that she had understood that by signing the verification of her schedules she was making an actual statement that they were true and accurate, and that it was her responsibility to make them so.

33. Frundt had made these statements in his November 14, 2002 letter to the Trustee.

34. The reason has to do with another bankruptcy case on which Frundt was representing another individual debtor, which was pending in active litigation while the homestead exemption issue in the Debtor's case was coming to a boil. After the Bankruptcy Appellate Panel issued its *Soost* opinion, Charles K. Soost had to contend with the judgment creditor that had successfully opposed his motion for lien avoidance in his

Chapter 7 case on the ground that its judgment lien did not impair the $1.00–valued exemption allowed to him in that case. After a year of face-off with the judgment creditor, Soost filed for Chapter 13 on June 27, 2002. In his plan, he proposed to treat the judgment creditor's secured claim by an amortization of the underlying debt over time and a large balloon payment at the end of a 60–month term. The judgment creditor's objection to confirmation was presented at an evidentiary hearing before the undersigned on November 27, 2002. This was three weeks after the Debtor here filed for Chapter 7. The decision on that matter was issued on March 6, 2003, about one week before the Trustee served his objection. *Frundt represented Soost in his Chapter 13 case.* That case was commenced for the sole purpose of dealing with the Bankruptcy Appellate Panel's ruling, that the facial recitation of the value of a claimed exemption is to be given utterly literal effect. *See In re Soost*, 290 B.R. 116, 127–130 (Bankr.D.Minn. 2003).

The damage came after the appellate decision invalidating the Wells Fargo Mortgage against the Ceylon home became final. With a wholly-unencumbered house, the Debtor went out to find a loan that would be secured by another mortgage. (She owed over $70,000.00 to Wollschlager, Tow & Welder, P.A., the law firm whose lawyers had represented her in her divorce proceedings and in the Wells Fargo foreclosure proceeding.[35] The Debtor wished to get the funds to pay that debt, so the firm would release the attorney's lien it had filed against the house. She also wanted to get funds "for other bills.") She located a prospective lender, First Franklin Financial Corporation, which committed to advancing her $100,000.00. Of the proceeds, $50,000.00 was paid to the Wollschlager, Tow law firm.[36] $14,349.00 was escrowed for the potential benefit of two pre-bankruptcy judgment creditors of the Debtor, to cover the possible attachment of judgment liens to the real estate. The remaining loan proceeds, net of various costs and expenses of closing, were paid to the Debtor, in the amount of $27,286.53. Later, after the discharged status of the debt to the two pre-bankruptcy judgment creditors was established, the escrowed funds of $14,349.00 were also released to the Debtor.

The Debtor had waited a year after the grant of discharge in her bankruptcy case before she looked for a mortgage-secured loan. When she decided to go ahead, she did not contact the Trustee to advise him of her intent to do so. (The Trustee did not find out about the Debtor's actions regarding the loan until early June, 2004, after the loan had closed and, apparently, the Debtor had fully dissipated the proceeds.) However, she did consult Frundt before she went ahead to a closing, "to make sure everything was okay," that is, whether the bankruptcy case affected her right to proceed. He told her that she "could refinance since it was a year since discharge." [37] He did not tell her to notify the Trustee. Later Frundt was involved with the financing transaction on the Debtor's behalf, when he procured releases of any claim of judgment lien from the creditors whose potential interests had prompted the escrow at closing.

After the Debtor received the net proceeds from the loan, $41,635.53, she used the money to "replace some things lost in the divorce," including "a riding lawnmower and some stuff in the house." She likely used the balance for current living expenses. In any event, she did not turn over any of the proceeds to the Trustee.

■ The issue of whether the Debtor acted "fraudulently" in her extraction of the equity in the house is a little closer than the one regarding the income tax refunds. However, the evidence ultimately requires a finding in favor of the Trustee on this point as well.

The evidence must be evaluated in light of the relative clarity of the order that

**35.** Of this amount, at least $24,510.82 was accrued before the Debtor's bankruptcy filing, as evidenced by the entry for the firm's secured claim on her original Schedule D. The balance was accrued post-petition, on the appeal in the foreclosure proceeding and on remaining issues in the divorce matter. Per the testimony of Joel Welder, Esq., "the divorce was very hotly contested." The length of the foreclosure proceeding is self-evident, given the circumstances noted earlier.

**36.** Welder testified that the firm voluntarily compromised its claim against the Debtor when the prospect emerged of finally getting paid out of the new loan transaction.

**37.** In his testimony, Frundt denied any memory of what he told the Debtor during this conversation.

established the Debtor's and the estate's contending rights to the value of the interest in the house. From a jurist's perspective—i.e., concerned foremost with the clarity of affected laypersons' comprehension of the consequences for them—the operative text of the order was not as full or evocative as might be desired. Nonetheless, it overtly conveyed the idea that the Debtor had protected "nothing" of the value of her equity interest, whatever that was. The Debtor apprehended something like this when she received the notice of the Trustee's objection, because she contacted Frundt right away.[38] She clearly was understanding enough from the objection and the proposed order to make her "extremely upset" and (obviously) afraid.

The disjunction between the clear import of the Trustee's objection and Frundt's ensuing blandishment was patent. This was a clue as to the quality of Frundt's evaluation, actually the first that the Debtor received. This *de facto* notice that something might not be quite right would have prompted some persisting skepticism from any reasonable person. That incipient doubt should have come back to mind later, when the Debtor sought advice from Frundt before mortgaging the subject of the exemption order. When, after receiving his advice, she went ahead to pull most or all of the equity out of the house, she did so with enough knowledge that the Trustee might have strong contentions with her doing that. The Debtor may not have had a very specific understanding of the processes of exemption and liquidation under Chapter 7, but she did know that a debtor could "lose" assets by going through bankruptcy. She understood the Trustee to have power over such an event. The order made it quite clear that she had saved "nothing" by way of value in the equity for her own future benefit, while she was going through the process of bankruptcy. So she knew of the potential impropriety of going ahead with the loan and mortgage, at least to the point that a duty fell on her to clear the matter directly with the Trustee. Yet she went ahead to close on the loan and mortgage, and then dissipated the liquid value that resulted, without consulting the Trustee.

Frundt's answers to the Debtor's questions for the loan transaction do not support an "advice of counsel" defense. To anyone who knows the basics of bankruptcy, the inapposite character of Frundt's statement is clear: in a Chapter 7 case the grant of a debtor's remedy of discharge has no direct interaction with the separate and independent creditor's remedy of estate administration. Put more specifically, no provision of the Bankruptcy Code could be read even remotely to terminate a debtor's responsibilities to a trustee upon a grant of discharge in bankruptcy. As a relatively unsophisticated layperson, the Debtor is not automatically charged with a technical understanding of this point of law, even one as basic to bankruptcy as this. But by then—a year and more after the sequence of events surrounding her dissipation of the tax refunds—enough inconsistency between Frundt's expressed take on things and the Trustee's articulated position was right in front of her. Thus, the reasonableness of Frundt's advice on so portentous a transaction was not to be assumed.

It is a hard thing to judge the reliance of a layperson-client on her attorney's advice

---

**38.** Loc. R. Bankr.P. (D.Minn.) 9013–2(a) requires a proposed order to be served with any motion, to put the respondent on full notice of the specific structure of relief that the movant seeks. The Trustee here served one such on the Debtor and her counsel. Upon the Debtor's default, the order was entered as proposed.

so harshly, in hindsight. However, the reasonableness of Frundt's shallow assurances was so dubious that it reinforced the Debtor's obligation to contact the Trustee directly.[39] The Debtor knowingly and deliberately failed to apprise the Trustee of her contemplated liquidation of a substantial estate asset and her unauthorized use of proceeds that were legally subject to his administration.

These findings satisfy the Trustee's burden to prove that the Debtor acted fraudulently. The Debtor's discharge must be revoked for her conduct in connection with this category of asset, as well.

### C. Sale Proceeds of Snowblower–Attachment

The Trustee also takes issue with the Debtor's actions as to two categories of personal property.

 The first stems from the Debtor's ownership of a large mechanical implement for the clearing of snow, about eight feet wide, that is attached to a tractor for use. When she filed for bankruptcy, the Debtor was storing this in the machine shed on her home property, with other large items. She had been awarded it under the decree of dissolution of marriage to Edward Chojnacki, as part of the division of marital property; it was included in the enumeration of personal property in the relevant terms of the divorce decree, a copy of which she gave to Frundt during their pre-bankruptcy consultation. Frundt did not separately note the snowblower attachment in the Schedule B that he prepared

for the Debtor. The Schedule's only completed line-entry corresponding to tangible, non-vehicle personal property is Item 4, "Miscellaneous Household goods and furnishings," with an assigned value of $3,465.00.[40]

At trial, the Debtor acknowledged that "nothing out in the machine shed was on there," i.e., listed on her original Schedule B. She also stated that at the time of her bankruptcy filing she "thought it"—i.e., the snowblower attachment—"was junk."

As noted earlier, after the meeting of creditors the Debtor sold the snowblower attachment for $1,800.00. The buyer was someone from North Dakota, whom a friend of the Debtor's had located. The Debtor did not ever disclose her ownership of this asset to the Trustee, formally or informally. She dissipated the proceeds of the sale without informing him of the transaction or asking his permission.

To make out his case on the element of fraudulence here, the Trustee points to nothing more than the lack of a separate entry for the snowblower attachment in the Debtor's original bankruptcy schedules, and that the item ultimately had a value of some substance that the Debtor took for her own use. But this is not enough to support an inference on the ultimate fact, a fraudulent intent to mulct the estate.

To the contrary, there is no evidence that the Debtor knew before she sold it that the Trustee could lay claim to the

---

**39.** Other than the few phrases quoted, there is very little in the record as to the content or wording of any of the communications between the Debtor and Frundt. The probity of Frundt's testimony was impaired by his repeated statements that he had no memory of particular conversations with the Debtor. However, nobody seriously pressed either him or the Debtor for more precision. Even given the implications of the attorney-client privi-

lege, the underlying strategy is somewhat obscure—unless Frundt indeed said almost nothing of weight to the Debtor, as the record suggests.

**40.** Frundt asserted in his testimony that he had "primarily ... looked at the ... decree for the legal descriptions" of real estate, while he prepared the schedules.

snowblower attachment. The dimensions of this conclusion are both factual and legal. The Debtor was not aware that the snowblower attachment had significant value until she sold it; thus, there is no evidence to support the existence of fraud at any point before then. For to the time after that, there is no evidence that she was aware that the Trustee could make any claim to the snowblower attachment or its value, as non-exempt property of the estate. Nothing to that effect was broached at the meeting of creditors, raised by any communication between the Trustee and the Debtor or her counsel, or litigated in a formal court proceeding. The Debtor was never put on notice that the snowblower attachment was not hers to freely dispose of.[41]

The Trustee failed to prove that the Debtor was aware of the wrongfulness of her acts with respect to the snowblower attachment, or that she deliberately failed to disclose any aspect of them to the Trustee. Thus, her actions with respect to this category of asset are not a basis for revocation of her discharge.

### D. Various Unscheduled Personal Property

■ The last category of assets on which the Trustee made complaint for revocation of discharge consists of a low-balance personal savings account and several larger items of tangible personal property

that the Debtor owned when she filed for bankruptcy: the Indian moped or motorcycle, the Amana freezer, a satellite dish and receiver, and a horse trailer. The Trustee ostensibly based a separate count under § 727(d) on this category of assets; but he gave precious little attention to developing a theory under the statute after that.

One can understand the cumulative annoyance to a fiduciary already vexed by other, much grosser derelictions and delictions on the part of a debtor and her original attorney. One can credit an impulse to vindicate the estate's interests and the integrity of the bankruptcy system alike, in the wake of such a mess. Nonetheless, the attempt to propel a request for revocation of discharge on this category of assets was a throwaway, unworthy of putting into suit and not deserving of much time and treatment. There is no basis for sanction under § 727(d) as to these assets, and the Trustee's request for relief on this account must be denied.

The reason is that the Debtor did not commit the threshold act that triggers the remedy: she did not *acquire* these assets, or become entitled to acquire them, after her bankruptcy filing. She held them, in their raw form, when she filed. She did not convert any of them to liquid funds via sale, hypothecation, or other extraction of fungible value from their original form.[42]

---

**41.** In this respect, there is a crucial distinction between the value of the snowblower attachment as an asset *potentially* in play in the administration of the estate, and the tax refunds and house equity as assets *actually* in play in the case and known by the Debtor to be in contention between her and the Trustee. Before the snowblower attachment was gone, the Trustee did not even know of its existence; hence, he had not raised the issue of recovering it for the estate as he had with the first two groups of assets. Thus, the Debtor's non-disclosure will have consequences for her, but only to the extent of having to account to the

estate for the value. Her intent in taking the value for herself was not so blameworthy as to merit revocation of discharge on account of that isolated transaction.

**42.** This distinguishes the Debtor's conduct in relation to these items from that regarding the tax refunds, the house equity, and even the snowblower attachment. The Debtor reduced all of those to cash, via her own liquidation, in the process acquiring something in a different form. And that form is just what the bankruptcy estate would have acquired in liquidation, had things gone properly.

She held them in the same form throughout the case and, indeed, has already been ordered to turn the assets themselves over to the Trustee. But however much she should have disclosed them in the first instance and then surrendered them early, her act of simply retaining them did not trigger revocation of discharge, given the plain meaning of the statute's verbs.[43] So the Trustee's request for revocation of discharge on this category of assets fails as well.

### E. The Outcome

The Trustee did not prove up a case for revocation of discharge on every factual basis he argued, but he did do so as to the Debtor's unauthorized disposition of the categories of assets that were the most valuable. Thus, he is entitled to judgment for this relief.

### II. Trustee's Objection to Debtor's Amended Claim of Exemptions

For nearly four years after her bankruptcy filing, the Debtor and Frundt took no action to assert or safeguard her a legal right to retain equity of any dollar-value in the house she occupied, the value of her right to income tax refunds, or both; this despite the fact that she had had powerful exemption rights that could prevent the liquidation of some or all of those assets. For almost half of that time, the Trustee was somewhat passive in pursuing the recovery of that value. But when he did get proactive, in mid–2004, the Debtor and Frundt were on unequivocal notice of his intentions, driven as they were by his fiduciary obligation to maximize a recovery for the Debtor's creditors. They knew, beyond doubt, that he would try to recover all asset value that the Debtor had not claimed and been allowed as exempt. But even then they took no action to fend off the Trustee, by amending the Debtor's claim of exemptions.

The Trustee went ahead as he had to, commencing this adversary proceeding. He also sued out a separate one, ADV 05–3271, against First Franklin Financial Corporation and the Wollschlager, Tow law firm, to address the unauthorized attachment of the post-petition mortgage to the Debtor's house and the dissipation of the loan proceeds. The litigation of both slogged through the discovery process and separate motions for summary judgment. The bankruptcy estate incurred attorney fees, over $25,000.00 in total through the date of the trial in this adversary proceeding. The other adversary proceeding was settled, under terms that included payment of $45,000.00 to the Trustee from the defendants in that matter.

Through all of this—that is, for nearly two years beyond an original eighteen months of quiescence—the Debtor and her attorney allowed all right to the house equity and the tax refunds to remain as configured under her original claim of exemptions, i.e., left entirely within the bankruptcy estate. This status persisted beyond the date (not clear from the record) when the Debtor and Frundt parted ways as attorney and client, *de facto,* and even beyond the date on which Iannacone undertook representation of the Debtor for

---

**43.** Had the Trustee timely sued out an objection to discharge under, say, 11 U.S.C. §§ 727(a)(2)(B) or 727(a)(4)(A), the inquiry would have gone beyond that, to the issue of the Debtor's actual intent. Those statutes allow *denial* of discharge for a concealment of existing assets from a trustee. To be sure, the Trustee had no basis for going forward under those statutes before he was time-barred. But that does not mean he can now backfill his legal theory, arguing a tacit engrafting of concepts into the governing statute, which otherwise lacks proper enabling language on its face.

her bankruptcy matters.[44]

It was only when a potential end-game tactic by the Trustee neared realization—the date set for a hearing on the Trustee's motion for summary judgment in this adversary proceeding—that the Debtor asserted a right to exempt these assets by filing an amended Schedule C.

By that point, of course, the estate was indebted for attorney fees of $20,000.00 or more, all incurred in the multi-directional effort that was required of the Trustee to redress the Debtor's post-petition actions and to recover value that should have reposed, unadministered, in the bankruptcy estate all along.

So the Trustee objected to the Debtor's amended claim of exemptions, as it pertained to these assets. The stated basis for the objection was that the Debtor had acted in bad faith throughout and especially in making the amendments, and that the bankruptcy estate would be prejudiced if the amended exemptions were allowed.

 Case law precedent recognizes this theory of objection, as to an amended claim of exemption that otherwise would be allowable on the abstract application of the statutory text cited by the Debtor. In *In re Kaelin*, 308 F.3d 885 (8th Cir.2002), the Eighth Circuit recognized the general policy underlying Fed. R. Bankr.P. 1009(a),[45] toward liberality in allowing a debtor to amend claims of exemption. However, it recognized that "[t]he two . . . exceptions to the rule . . . are bad faith on

the part of the debtor and prejudice to the creditor." 308 F.3d at 889. *See also In re Ladd*, 450 F.3d 751, 755 (8th Cir.2006); *In re Bauer*, 298 B.R. 353, 356 (8th Cir. BAP 2003).

 The case law fleshes out these concepts. Standing alone, a mere lapse of time between original and amended claims of exemption does not require a finding of bad faith, even if it is lengthy. *In re Ladd*, 450 F.3d at 755; *In re Kaelin*, 308 F.3d at 889. But, "[w]hen it is discovered that a debtor has attempted to hide an asset, it will generally support a finding of bad faith." *In re Kaelin*, 308 F.3d at 890. A debtor's persisting failure to amend schedules to correctly reflect the values of an asset and its associated exemption can constitute this sort of concealment, at least where the debtor has knowledge of a value substantially greater than that scheduled and certainly where the debtor exploits that enhanced value for other purposes in transactions extraneous to the bankruptcy process, in relative proximity to the bankruptcy filing but unknown to the trustee. *In re Bauer*, 298 B.R. at 357.

 The other alternative, resultant prejudice to creditors, is not met by the mere circumstance that the allowance of an amended claim of exemptions on its abstract merits would deprive the estate of an asset that it would have retained under the prior configuration of rights between the debtor and the estate. *In re Ladd*,

---

44. Frundt has never appeared on behalf of the Debtor in this adversary proceeding; Iannacone filed the answer for her and has represented her throughout. Frundt and Iannacone never filed a substitution of attorneys in BKY 02–93495; Iannacone first popped up in the main case in mid-August, 2006, when he filed the amended schedules. As a result, Frundt is still considered to be counsel of record for the Debtor in BKY 02–93495, under Loc. R. Bankr.P. (D.Minn.) 9010–3(e)(4).

45. The relevant text of this rule is:

 (a) **GENERAL RIGHT TO AMEND.** A voluntary petition, list, schedule, or statement may be amended by the debtor as a matter of course at any time before the case is closed. The debtor shall give notice of the amendment to the trustee and to any entity affected thereby . . .

450 F.3d at 755. It is established "if the creditors suffer actual economic loss due to a debtor's delay in claiming his exemption." *In re Kaelin,* 308 F.3d at 890. "Prejudice to creditors may also be shown by proving the amendment would harm the litigation posture" of the estate. *Id.* Detriment to litigation posture occurs where the bankruptcy estate would have taken different actions or asserted different positions, had the debtor made the amendment with dispatch and where "the interests of the [estate] are detrimentally affected by the timing of the amendment." *Id.* (quoting *In re Talmo,* 185 B.R. 637, 645 (Bankr.S.D.Fla.1995); interior quotes omitted).

■■■■ "The loss [to creditors' interests] that occurs when any asset is claimed exempt" is not a detrimental effect under this test. *Id.* But under this alternate theory a trustee "can show prejudice if [he] would have asserted different positions [in administering the estate or litigating exemption issues] had the exemption been claimed earlier," *In re Ladd,* 450 F.3d at 755 (citing *In re Kaelin,* 308 F.3d at 890), and if the delay resulted in an actual harm to the estate's recovery of assets. Such a diminution occurs if assets that would be subject to administration under the second-claimed configuration of exemptions have been dissipated or lost in the meantime, or if the recovery of corresponding value will require the estate to incur attorney fees that would reduce the net distribution to creditors that would have taken place had the debtor seasonably claimed the exemptions.[46]

■■■■ Here, the Trustee has proved up that the Debtor harbored bad faith in her action and inaction on the matter of exemptions, and material prejudice to the estate. Both of these ripened over the 44–month delay, between the time that the potential infirmity of her original claim of exemptions first emerged and the date on which Iannacone finally filed an amended Schedule C. The Debtor's amended claims of exemption must be denied force and effect. She must account to the estate for the value of all assets that were non-exempt under the original configuration of her allowed exemptions, which she converted to her own use during the pendency of the case.

In this context, the Debtor's bad faith is established by the same complex of facts that went to fraudulent intent under § 727(d)(2), plus a few more. On two occasions before the meeting of creditors, Frundt advised the Trustee that he intended to amend the Debtor's claim of homestead exemption. His proposals were based on a theory of gross value that was marginally comprehensible at best, and not reduced to raw dollar-amount in his communications to the Trustee.[47] Beyond

---

46. This specific formulation of "detrimental effect" is not articulated as such in the appellate case law within the Eighth Circuit. If one construes the summary wording of the opinions in light of the actual mechanics and flow of bankruptcy estate administration, however, it is the only way to make sense of the alternative.

47. In his November 14, 2002 letter, Frundt stated:

I apologize for having no value placed on the homestead in this case. This was an oversight by myself and my staff. We be-

lieve the correct value of the land to be $28,900.00 pursuant to the form 1099–A issued in 2001 by Wells Fargo Bank.... However, you should be aware that the property is subject to a foreclosure proceeding which has already been started and currently is being challenged by Ms. Markey in State Court. Thus, the true value of Ms. Markey's property at the time of filing is somewhat less than the $28,900.00 figure. I will be filing an amendment with the correct amount very soon to correct this error.

that, Frundt did not take account of the substantial equity value that was properly chargeable to the Debtor in the bankruptcy context, that value subject to the invalid encumbrance of the Wells Fargo mortgage that was invalid *ab initio*.[48] He did some sort of work on amending the schedules, on November 20, 2002.[49] But *Frundt never followed through.*

A filed amendment would have put the issue of the market value of the house, and the true value of any exempt interest, firmly into issue. The Debtor herself contemporaneously recognized $5,000.00 of equity in the house, the difference between the value that she assumed at the time and the debt secured by outstanding encumbrances that remained of record.[50] Whether Frundt was contemplating this as the value of an amended homestead exemption is not clear. What remains, however, is that he and the Debtor never did a thing to amend, despite the fact that they both recognized an issue over exemptible value. This violated the Debtor's duty to the estate, of "updating schedules as soon as reasonably practical after he or she becomes aware of any inaccuracies or omissions." *In re Bauer*, 298 B.R. at 357.

The Trustee did nothing to challenge or upset the original legal configuration of allowed exemptions. However, he was within his rights in that. It was incumbent on the Debtor to protect her own exemption rights, via an amendment. True, the Trustee could have acted with greater dispatch to press the Debtor, by asserting a right to sell the house and administer the value of the non-exempt equity. But that does not excuse either the Debtor or Frundt. The statutory onus for the protection of value was on the Debtor; she was bound under law to make full disclosure and to cooperate with the Trustee in administration; she was in actual possession of these estate assets pending the Trustee's administration, and she alone had the right to claim exemptions.

The Debtor was on actual notice of several large and unsettling points of contention from the Trustee. Given that, and all of the prior findings under § 727(d)(2), it is properly inferred that she intended to conceal her receipt and disposition of the in-

---

Then, in his December 11, 2002 letter he shifted ground, to no less confusion:

> After speaking to the attorney handling the State Court proceeding with Ms. Markey, I have discovered that the property may be worth much more than what was stated in the 1099 form. According to the attorney's records, Wells Fargo is claiming a mortgage interest in the property in the amount of $97,000.00. However, you should note that the property is located quite close to a hog confinement facility of significant size. This facility is within less than a half mile of Ms. Markey's home. Thus, it is our belief the property is worth much less than the mortgage value.
>
> . . .
>
> Obviously, there are numerous numbers as to the true value of the homestead in this case. At this point, I have contacted a realtor to give me a figure as to what they believe the homestead is worth if Ms. Markey were to put it on the market today. I will provide this information to you upon receipt. It is my intent to amend the schedules to place this value in the proper places upon its receipt.

48. As the decision of the Minnesota Court of Appeals makes clear, the mortgage was invalidated due to the lack of a signature from the Debtor on its face, as Minn.Stat. § 507.22 required. *Wells Fargo Home Mortgage, Inc. v. Chojnacki*, 668 N.W.2d at 5–6. Thus, it is clear that the invalidation was effective as of the date of the purported grant; in essence, the mortgage never attached to the property.

49. This is evidenced by a line-entry in the recap from Frundt's law firm of services and charges to the Debtor, that is in evidence.

50. She testified to having harbored this belief at that time. The encumbrance she assumed was the Wells Fargo mortgage.

come tax refunds, and the true value of her exemptible equity interest in her house and her dissipation of that through the loan and mortgage. This intent persisted all through the time she retained Frundt as counsel. The further delay in amending her Schedule C, between the commencement of ADV 05–3269 and August, 2006 is only further (and more baffling) evidence of an intent to avoid acknowledging and bearing the consequences of the configuration of her assets, i.e., losing some assets no matter which set of exemptions were ultimately applied. An intent to avoid the issue is further evidenced by the fact that the amendments were lobbed in only a few days before the Trustee had teed up the issue for full airing, after he had properly relied on a record position that the Debtor had let sit for several years.

This intent matches to bad faith under the *Kaelin/Ladd* test. And that is enough to override the Debtor's broad right to amend her claim of exemptions under Fed. R. Bankr.P. 1009(a).

The Trustee also met the alternative under *Kaelin* and *Ladd,* by demonstrating actual prejudice to creditors. Had the Debtor and Frundt followed through on an amended Schedule C as he represented, at or soon after the meeting of creditors, the administration of this estate and the Debt-or's affairs in bankruptcy court would have been wrapped up several years ago. Whether the Debtor had used Minnesota or federal exemptions for the amendment, any claim of homestead exemption in an actual dollar-amount would have put the issue of the house's value right out in front. It then would have been settled in one of two ways: via the Trustee's acquiescence to the Debtor's statements of value and her calculations, or in early litigation over an objection by the Trustee. As it was, the disposition of the house itself through the bankruptcy process has been delayed for years; the realizable value of the house for any party has been grossly impaired by the complications from the post-petition mortgaging; and practically speaking, the Trustee was relegated to taking personal recourse against the Debtor for the equity value she converted to her own use, were it ultimately held that the value of the house remained in the estate under the original configuration of exemptions.[51] In total, this inflicted actual prejudice on the estate, measured directly by the much more complex and confounding legal issues that were created by the Debtor's actions, the multi-year delay in *any* realization by creditors, and the manifest uncertainties of collection against the Debtor now, on account of any component of the Trustee's judgments against her.[52]

---

51. Under approved and consummated settlement of the Trustee's litigation against the post-petition mortgagee and the Wollschlager, Tow law firm, the Trustee released those parties from all claims in suit in ADV 05–3271, and then obtained a dismissal of that adversary proceeding with prejudice. This left the mortgage of record against the house. No party in interest (including the Debtor) objected to this settlement. As a balancing of the risks of proceeding versus the respective realizations from full litigation and the compromise, it certainly fell above "the lowest point in the range of reasonableness," *In re New Concept Housing, Inc.,* 951 F.2d 932, 938 (8th Cir.1991); thus, it was approved.

52. For a defense on this point, the Debtor's current attorney presented an arithmetically-based theory under which he argued that creditors would actually come out ahead now in terms of a monetary distribution, even were the Debtor's amended claims of exemption allowed. The thought behind this pitch is that the amount extracted in settlement from the defendants in ADV 05–3271 exceeds the amount that the Trustee would have garnered in for administration had the Debtor timely claimed Minnesota state exemptions, kept her full equity in the house, and then had to surrender income tax refunds, bank account balances, and non-exempt personalty to the estate. This argument is overly cute, but

The same conclusion applies to the matter of the income tax refunds, with even greater strength. Had the Debtor made her amendment early and elected state exemptions, the nonexempt status of the right to refunds would have been reinforced.[53] The issue would have been much more focused in the attention of all parties; and, just perhaps, the Debtor would have been more responsive to the process and would have turned the checks or refunds over to Frundt. In any event, her act of dissipation, with direct knowledge of its impropriety, was enough to inflict material prejudice on the estate. The Trustee now is relegated to pursuing her individually, in whatever state of impecunity she may be, to collect on a judgment for the value that she converted to her own use. Had she promptly amended to Minnesota exemptions and early surrendered the tax refunds and other assets, the estate would have had value in hand and it would have incurred little or no liability for attorney fees in the collection.

One other right, assumed by the parties to be an asset as such, is implicated by the Debtor's amended claim of exemption and the Trustee's objection. In her amended Schedule C, the Debtor included a new entry for "SUIT AGAINST WELLS FAR-GO FOR INVALID MORTGAGE," citing the Minnesota homestead statute, Minn. Stat. §§ 510.01–.02, as the law providing an exemption. The Trustee objects to the amendment on the same grounds of bad faith and prejudice that he argued against the amendment on the main claim of homestead exemption. *If* this claim in litigation is indeed an asset in its own right, that rationale applies with equal strength under the earlier discussion, and the Debtor is barred from making the amendment.[54]

There is an alternate way to conceive of the "SUIT," however, which does not require one to even get that far, but which reaches the same result.

The right of action against Wells Fargo that the Debtor had asserted by counterclaim was, in substance, a request for declaratory judgment. The Debtor sought a determination that the mortgage had never attached to value in the Ceylon house. When the Debtor received that relief, she did not recover money from Wells Fargo, or even property. She received a judgment declaring that the attachment of the mortgage was invalid. The result of the post-bankruptcy adjudication to that effect was that the mortgage had never encum-

---

it is really more an act of *legerdemain.* It is not unlike a defendant in a wrongful death action trying to relieve himself of financial liability to the survivor-plaintiffs by arguing that they now have the proceeds of the decedent-victim's life insurance, to their benefit, and they did not before. It also ignores the massive prejudice suffered by the post-petition mortgagee and Wollschlager, Tow, measured in dollars alone by the $45,000.00 that they paid in total to the Trustee to avoid the risk of an adverse judgment on the merits. One could say that these two parties should have been more careful in determining and evaluating the Debtor's and the house's status in bankruptcy, before they closed on a post-petition transaction like theirs. But the fact remains that if the Debtor had enabled the resolution of all of her issues in bankruptcy by an early amendment, no party to the loan and mortgage transactions would have been put into any position of jeopardy under bankruptcy law.

**53.** Under the Debtor's original claim of exemptions, there was no mention at all of a right to tax refunds. This alone rendered them non-exempt. But in any event, the Debtor's use of the "wild card" of § 522(d)(5) as to other assets left no unapplied exemption rights to use on the right to refunds.

**54.** The Debtor categorized her entry for the "SUIT" on the amended Schedule C as an "Other Contingent and Unliquidated Claim[ ] of Every Nature."

bered the property, and certainly had not done so when the Debtor filed for bankruptcy. The corollary is that the value otherwise to be charged to the mortgage then was a matter between the Debtor and the bankruptcy estate, to be subject either to an allowed exemption or to administration by the Trustee.

The implication is that this claim in suit did not feature in the bankruptcy process as an asset of value in and of itself; nor was it cognizable in the exemption process as such. The value freed by the judgment automatically factored into the Debtor's claim of homestead exemption, because the value had inured to the Debtor all along due to the status of the mortgage *ab initio*.[55]

Either way, the result is that the Debtor may not exempt any value in the house that is attributable to her counter-claim in the Wells Fargo litigation.

As to the three categories of assets that were the subject of the Debtor's amended claims of exemption—the house equity, the right to tax refunds, and the claims in suit in the Wells Fargo litigation—the Trustee's objections are sustained. The non-exempt status of those assets and their value remains as it was before the Debtor's attempt at amendment.

### III. Trustee's Remaining Turnover Requests

The Trustee's right to relief in turnover against the Debtor was addressed in the November 30, 2006 order on the Trustee's motion for summary judgment in ADV 05–3269. Rulings were made in the Trustee's favor as to those components of asset value that were not subject to the Debtor's amended claims of exemption, which were then in contest. The Trustee's remaining requests for judgment were reserved pending a determination of the exemption issues.

Given the rulings under Section II of this decision, there is no question that the Trustee is as entitled to judgment on the balance of his requests as he was on the ones first treated. The Debtor is liable to the estate under the theory that she converted estate assets to her own use.[56] The Debtor raised no issue with the Trustee's calculation of the value that would be recoverable in this way. Those amounts are identified in his brief, and recalculated as appropriate in light of the rulings on the motion for summary judgment, as follows:

| | |
|---|---|
| Full 2001 Federal tax refund | $ 2,858.00 |
| Full 2001 Minnesota tax refund | $ 885.00 |
| Pro rata share of 2002 Federal tax refund ($3,843.00 × 310/365) | $ 3,263.92 |

**55.** The frame of reference of this discussion is rather abstract, but it is more accurate than the ones the parties fell into. Early in this matter the Trustee fell into the knee-jerk frame of reference of categorizing the Wells Fargo litigation as a "claim" or right of recovery that he could have parlayed to the estate's benefit in the form of collected funds, via judgment or some sort of horse-traded settlement. Somehow this perception was not shaken by the fact that the "claim" had already been reduced to a declaratory judgment by the time the Trustee had a fixed awareness of it. In any event, both sides never got above that mind-set to recognize the true essence of things.

**56.** This ruling is made under that theory in light of the Eighth Circuit's recent decision in *In re Pyatt*, 486 F.3d 423 (8th Cir.2007). The assets or their practical value may indeed be gone by now, and thus in a strict sense they are not subject to turnover under 11 U.S.C. § 542. But there is no question that the Debtor here had them all under her direct control, and she subverted their value to her own use, contrary to fixed statutory duties to the estate. Making the estate whole for that, as against the party who enjoyed the fruits of those actions, is perfectly defensible under the legal theory of conversion.

| | |
|---|---|
| Pro rata share of 2002 Minnesota tax refund ($1,210.00 × 310/365) | $ 1,027.67 |
| | $ 8,034.59 |

## ORDER FOR JUDGMENT

On the memorandum of decision just recited,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. The discharge granted to the Defendant in BKY 02–93495 on February 19, 2003, is revoked, pursuant to 11 U.S.C. § 727(d)(2).

2. The Debtor's claims of exemption as to the following assets, as set forth in an amended Schedule C filed in BKY 02–93495 on August 17, 2006, are disallowed:

Real property located at 473–120th Avenue, Ceylon, Minnesota, legally described as follows:

A tract of land in the Northeast Quarter of the Southeast Quarter (NE 1/4 SE 1/4) of Section Fourteen (14), Township One Hundred One (101) North, Range Thirty-two (32) West, in Martin County, Minnesota, described as follows: Commencing at the Southeast corner (SE 1/4) of Section Fourteen (14), Township One Hundred One (101) North, Range Thirty-two (32) West in Martin County, Minnesota; thence North 0 degrees 00'00" East along East line of the Southeast 1/4 (SE 1/4) 2255.74 feet to the point of beginning; thence North 89 degrees 27'57" West 557.10 feet to an iron pipe survey marker; thence North 0 degrees 00'00" East 391.00 feet to the North line of Southeast Quarter (SE 1/4); thence South 89 degrees 27'57" East along North line of Southeast 1/4 (SE 1/4) 557.10 feet to Northeast corner of Southeast Quarter (SE 1/4); thence 0 degrees 00'00" West along East line of Southeast Quarter (SE 1/4) 391.00 feet to the point of beginning. Subject to an easement for public roadway right-of-way along East line of Southeast Quarter (SE 1/4).

Rights to federal and Minnesota income tax refunds for 2001 (full year) and 2002 (pro rata to date of Defendant's bankruptcy filing)

"SUIT AGAINST WELLS FARGO FOR INVALID MORTGAGE."

3. The status of assets described in Term 2 as exempt/non-exempt shall continue to be governed by the Debtor's original Schedule C in BKY 02–93495, and the operation of applicable statute and rule.

4. In consequence of the Defendant's post-petition conversion of property of the bankruptcy estate that was not allowed to her as exempt, the Plaintiff shall recover from the Defendant the sum of $51,470.12, corresponding to the following assets and their values:

| | |
|---|---|
| Equity in real estate at 473–120th Avenue, Ceylon, Minnesota | $41,635.53 |
| Right to receive income tax refunds | $ 8,034.59 |
| Snowblower attachment | $ 1,800.00 |
| | $51,470.12 |

5. Pursuant to 11 U.S.C. § 542(a), and to the extent she has not done so yet, the Defendant shall forthwith turn over to the Plaintiff, at her sole expense and at a location of the Plaintiff's determination, the physical possession of the following tangible personalty:

a. 10–foot bumper hitch tandem horse trailer;

b. Indian Moped;

c. Satellite dish and receiver;

d. Amana chest freezer;

e. 10 large Wenco steel vinyl windows; and

f. 6 small Wenco steel vinyl windows.

LET JUDGMENT BE ENTERED IN ADV 05–3269 IN ACCORDANCE WITH TERMS 1, 4, and 5 OF THIS ORDER.